97 N.J. Super. 295 (1967)
235 A.2d 45
IN THE MATTER OF THE APPLICATION OF MAX KLAYMAN AND SYLVIA KLAYMAN.
Superior Court of New Jersey, Law Division.
Decided October 16, 1967.
*296 Mr. Max Klayman for petitioners.
Mr. John W. Noonan for incumbents.
Mr. Albert Poll, Assistant County Counsel, appearing for the Essex County Board of Elections.
Mr. Patrick J. Hanifin for the Superintendent of Elections of Essex County.
STAMLER, J.S.C.
Petitioners Max Klayman and Sylvia Klayman, candidates in the September 12, 1967 primary election for the office of Democratic county committeeman, male and female, respectively, to represent the 6th election district of Livingston Township, petition this court to set aside the election of the incumbents Frank Wexler and *297 Frances Petrucelli who had conducted a write-in campaign. Also responding were the Essex County Board of Elections and the Superintendent of Elections of Essex County.
Forty-eight voters cast ballots in this Democratic primary. Eleven failed to cast any vote for county committeeman, male, and 13 did not vote for any county committeeman, female.
The certificate of election indicated that Wexler had received 19 votes as against 18 votes for Max Klayman for county committeeman, male, and Mrs. Petrucelli had received 18 votes as against 17 votes for Mrs. Klayman, county committeeman, female.
The Klaymans' names appeared on the ballot in positions 16A and 18A. Wexler and Mrs. Petrucelli had decided to conduct a write-in campaign and furnished friends and neighbors with adhesive-backed white labels with their names stamped thereon, with brief instructions as to how and where the labels were to be placed.
At or about 6 P.M. on election day Mrs. Klayman, Democratic voter No. 14, entered the polling booth, drew the curtain and noted that her name and that of her husband on the face of the machine were obliterated by a "white tape-like substance." Surprised and shocked, Mrs. Klayman immediately drew back the curtain, thereby registering a vote but without having in fact voted for anyone including her husband and herself.
She called to Republican Mrs. Roberta Clure, judge of the district board, and Democrat Herman Targansky, clerk, and directed their attention to the face of the machine. Targansky immediately began to remove the sticker with his fingernail and was moments later assisted by Mrs. Clure.
Mrs. Klayman immediately called friends who had already voted and learned that some of these had been unable to find the name of Klayman on the ballot.
When the polls closed and the back of the machine was opened, there appeared a number of written or printed names of Wexler and Mrs. Petrucelli and a number of tape-like *298 labels with the names of the two write-in candidates stamped thereon.
Mrs. Klayman observed, and the petition charges, that "the patches of white tape were identical with the patches of white tape which were used by the incumbents, Frank Wexler and Frances Petrucelli and others who voted for them to place their name on the irregular ballot."
The prosecutor and the Livingston police promptly began an investigation. The Klaymans filed the present proceeding charging a violation of N.J.S.A. 19:29-1(e), (f), and (g).
Charging fraud and collusion, the petition alleged that the impairing and defacing of the voting machine ballot with the stickers caused the loss of votes to petitioners and the receipt of illegal votes sufficient in number to change the result of the election, and further, that the county board of elections was in error in counting the votes and declaring the results of the election.
Petitioners ask this court not only to set aside the election of the incumbents but also to declare that the Klaymans were duly elected.
In addition to the charges of fraud and collusion, petitioners assert that three of the write-in votes in column 18 (county committeeman, female) were for "Fran Petrucelli" and not "Frances Petrucelli," and there was neither party nor office designation on the paper roll. They further show that two of the votes in column 16 (county committeeman, male) were for Frank Wexler without similar designation.
It was a complete mystery to all counsel and to the court in the early stages of the trial as to who had placed the stickers on the face of the machine obliterating the names of the Klaymans. The truth was unearthed during the presentation of evidence. The court had the opportunity as to each witness to observe the demeanor, mental capacity and qualifications, and to consider the interest or motive which any witness had in the outcome. Minor contradictions of no consequence did occur, but on the whole, as to the *299 important relevant factual issues, all witnesses were straightforward and truthful.
Except where it is necessary in support of the findings of fact and the conclusions of law hereinafter set forth, the names of the various voters are not set forth, for it adds nothing but embarrassment and in some instances ridicule. The voters hereinafter designated by number only were Democratic primary voters.
The following voters (not in the order listed) were called by petitioners: Nos. 9, 10, 11 (Mrs. Petrucelli), 13, 14 (Mrs. Klayman) and 18. With the suspense of the mystery increasing, petitioners almost at the close of their case called voter No. 8, who testified as follows: She voted between 1 and 2 P.M.; had with her the Wexler-Petrucelli stickers; had not on any prior occasion voted an irregular (write-in) ballot; attempted to slide the stickers under a fixed metal strip running along the width of the entire voting machine directly above line A (the Democratic line); when this could not be done, and misunderstanding proper voting procedure, she placed stickers over Klayman names in 16A and 18A, registered what she thought was her vote and departed the polling place.
Voter No. 9 went into booth, noted two stickers, could not find Klayman names, intended to vote for them, and left without being able to do so.
Voter No. 10, after closing the curtain saw two stickers, could not find Klayman names, faintly remembered the sample ballot, believed she pulled down levers above where the Klayman names should have been, and after voting reported to an inspector of elections (a Democrat recommended for appointment by the Klaymans), who attributed the voter's failure to find the Klayman names to her being without reading glasses.
Voter No. 11 (Mrs. Petrucelli) raised the slides in columns 16 and 18, affixed stickers, voted, and left without seeing stickers on the Klayman names; she first learned of *300 the obliteration after the polls closed but did not know who did it.
Voter No. 13: studied the ballot on the machine, did not see the Klayman names although intending to vote for them, thought that perhaps they had decided not to run, did not lower the levers over 16A or 18A, voted and on the way out saw Mrs. Klayman but said nothing to her.
The testimony of Voter No. 14 (Mrs. Klayman) has been reviewed above. It was then that the first obliteration was discovered and the stickers removed.
Voter No. 18 entered the booth, had never voted an irregular ballot before, placed the stickers over the Klayman names and departed.
What happened thereafter has not been shown, but the stickers bearing the Wexler and Petrucelli names were removed certainly before the examination of the machine at the end of the voting day, although remnants of a yellow adhesive were discerned on the face of the machine. When or by whom they were removed is unknown.
Mrs. Clure, judge of the board, who had served in three elections as a member of district boards, testified that she had never received instructions that the official attending the voting machine was required by law to inspect the machine and specifically the face of the ballot as each voter left the booth.
Targansky corroborated this testimony. He and Mrs. Clure each received four pages of complex printed instructions from the county board of elections, which instructions contained no mention whatsoever of this most important duty.
In any event, no official at district 6 looked at the machine after the vote.
Stephen F. Byrne, chairman of the Essex County Board of Elections, acknowledged that neither verbal nor written instructions were given as to the obligation of inspection. It had not been done in the last 70 elections.
*301 The county board of elections through its attorney argues that (a) it would create quite a burden on the district election officials to follow the mandate of the statute and examine the face of the machine after each vote, and (b) to its knowledge this practice had not been followed since the advent of voting machines more than 70 elections ago  other counties have followed a like procedure. It is urged that because this has been the practice the court should not now declare this election or its results void. But practice in contravention of law may not be condoned because it is in common use. In re Livingston, 83 N.J. Super. 98 (App. Div. 1964).
Byrne agreed that had the district board officials been so instructed and had they followed the instruction, what happened in district 6 could not have occurred.
The fact that each district board is supplied with a printed copy of the entire Title 19, "Elections," does not fill the void. Title 19 in many places is confusing, to say the least, to those trained in legal interpretation, lawyers and judges alike. District election officers should not be expected to search all of Title 19 to ascertain their duties.
N.J.S.A. 19:50-1 requires:
"Not less than ten nor more than twenty-one days before each election, the county board of elections shall cause the members of the district boards who are to serve in election districts to be instructed in the use of the machine, and in their duties in connection therewith, and shall cause to be given to each member of each district board who has received such instruction and is fully qualified to properly conduct the election with the machine, a certificate to that effect; provided, however, that members of district boards of elections who have served in a district or districts in which voting machines have been used for two consecutive general elections and who have received such certificate shall not be required to receive further instruction, except in the discretion of the county board of elections. For the purpose of giving such instruction the county board of elections shall call such meeting or meetings of the district boards as shall be necessary. The members of the district board of each election district in which a voting machine is to be used, unless excused from such attendance as herein provided, shall attend such meeting or meetings as shall be called for the purpose of receiving such instruction *302 concerning their duties as shall be necessary for the proper conduct of the election with the machine. No member of any district board shall serve in any election at which a voting machine is used unless he shall have received such instruction and is fully qualified to perform the duties in connection with the machine, and has received a certificate to that effect from the county board of elections; but this shall not prevent the appointment of a person as a member of the district board to fill a vacancy in an emergency, as now provided by law." (emphasis supplied)
Targansky received his certificate and served at the election although he, along with many others, did not attend the instruction class and the appointments were not emergency appointments.
N.J.S.A. 19:52-2 in part reads:
"The district election officer attending the machine shall inspect the face of the machine after each voter has cast his vote, to see that the ballots on the face of the machine are in their proper places and have not been mutilated or defaced and that the machine has not been damaged."
The provision is clear and succinct.
Byrne stated in open court that no matter what the decision herein may be, every district election board official will be notified well in advance of the general election, November 7, 1967, of the specific duty to inspect the face of the machine immediately after the voter leaves the booth. This will prevent an innocent or even intentional defacement.

I
The failure to place a checkmark alongside the name on a write-in ballot was held to invalidate the vote. In re Koegh-Dwyer, 45 N.J. 117 (1965). There the court considered the statutory design as it related to paper ballots in a primary election. This rule does not apply to an irregular ballot cast on a voting machine. In re Recheck of Irregular Ballots, Borough of South River, etc., 26 N.J. Super. 357 *303 (Law Div. 1953), vacated 27 N.J. Super. 109 (App. Div. 1953).
In In re Application of Sweetwood, 91 N.J. Super. 496 (App. Div. 1966), the ballot was held to be sufficient where the office and the name of the candidate appear, but invalid where the office is not designated. This case is distinguishable. The court there considered an absentee ballot in a general election. Here the irregular ballot was cast by voting machine, and party and office are scientifically determinable.
N.J.S.A. 19:48-1 (m) sets forth one of the physical requirements of a voting machine:
"It must permit a voter to vote for any person for any office whether or not nominated as a candidate by any party or organization by providing space for writing in such names or name."
The required space for an irregular ballot is for "name or names." Nothing is said by the Legislature about space for office, party designation or check mark. The court will judicially notice that the space available is small and that it would be difficult and almost impossible to write the full name and middle initial of some unfortunate candidate with multi-syllable first names and last names.
With the machine locked in party position at a primary, an examination of the paper roll when the votes are counted clearly shows the column (and therefore the office) and whether the specific vote was Democratic or Republican. This was readily demonstrated at the trial by Ervin Bell, chief mechanic of the Essex County Board of Elections, admittedly an expert in the operation of voting machines.
The irregular ballot on the voting machine roll clearly designates what might not be apparent on the paper ballot. It is concluded, therefore, that the "write-in" votes which do not bear a checkmark or office or party designation are not invalidated when a voting machine is used.

*304 II
Relying on Weeks v. Kip, 64 N.J.L. 61 (Sup. Ct. 1899), petitioners argue that three votes cast for "Fran Petrucelli" rather than "Frances Petrucelli" be invalidated.
At an election for village trustee four of the ballots counted for Ira A. Kip, Jr., read respectively, "Ira A. Kipp," "I Kip, Jr.," "Ira A. Kip," "Kipp." The court determined that these ballots were illegally counted for Ira A. Kip, Jr. and that the Circuit Court, upon a recount of the ballots, was right in refusing to admit proof that no other person by the name of Kip was a candidate at the election or resided within the voting district.
Today, however, the machine assists in determining the vote cast. In order to vote for one whose name does not appear on the voting machine, provisions in the law relating to irregular ballots must be observed. N.J.S.A. 19:49-5.
This court should not disfranchise a voter where there is no specific legislative language requiring it to do so. The small space provided for the true "write-in," the slant which makes it difficult for a left-handed person, the absence of a middle initial, the incorrect spelling of the long and fully consonanted name  these should not be reasons in and of themselves to void a ballot. The test should be the free expression of the voter and whether it is clear for whom the vote was intended and for what office. Cf. In re Clee, 119 N.J.L. 310 (Sup. Ct. 1938).
The request to set aside the votes for "Fran Petrucelli" is denied.

III
The real issue, however, is the charge of fraud and collusion in the obliteration of the names on the ballot. No fraud or collusion is found. The fault here lies not with the voters, the candidates or the incumbents. Nor is blame to be directed at the district election officers. The county board of elections neglected a statutory obligation, and for that reason alone this dispute came into existence.
*305 The court said in In re Hackensack Recall Election, 31 N.J. 592 (1960):
"In the absence of malconduct or fraud, we cannot overturn a concluded election for an irregularity in the ballot unless in all human likelihood the irregularity has interfered with the full and free expression of the popular will, and has thus influenced the result of the election." (at p. 595)
And in Wene v. Meyner, 13 N.J. 185 (1953), the court said:
"Where, as here, there is an unwitting omission of a formal requirement otherwise supplied in substance, the ballots are invulnerable; the overturning of the result in such circumstances would frustrate the will of the voters for errors and omissions of form not related to the merits; and this would do violence to the legislative will. In this regard, acts and omissions by the district board mandatory before election may for reasons of policy be deemed directory after the election, if it indubitably appears that the election result was not thereby prejudiced. The question is essentially one of fairness in the election. An election is not vitiated by the defaults of election officers not involving malconduct or fraud, unless it be shown that thereby the free expression of the popular will in all human likelihood has been thwarted." (at p. 196)
In the case at bar, it indubitably appears that the election result was prejudiced. Here voters for the Klaymans were deprived of an opportunity to express their will. When the Wexler-Petrucelli names obliterated the Klayman names in both instances, it is very possible that a Wexler-Petrucelli follower pulled down a lever over those names and unwittingly cast a ballot for the Klaymans.
The corrective measures promised by the chairman of the county elections board will probably prevent a recurrence. However, the election was very close, but one vote apart. It is the opinion of this court that the irregularities (or the absence of regularity) infected the contest and under the circumstances of this case I hold that the full and free expression of the popular will has been subjected to interference. This infection spreads not only to the incumbents but to the Klaymans also.
*306 In accordance with N.J.S.A. 19:29-9 the certificates of election issued to Frances Petrucelli and Frank Wexler for the office of Democratic county committeeman (female) and Democratic county committeeman (male), respectively, are annulled and the positions declared vacant.