129 N.J. Super. 296 (1974)
323 A.2d 521
IN THE MATTER OF THE PETITION OF FIFTEEN REGISTERED VOTERS OF THE COUNTY OF SUSSEX ON BEHALF OF JOAN M. FLANAGAN, CANDIDATE FOR THE OFFICE OF COUNCILMAN IN AND FOR THE TOWNSHIP OF SPARTA IN THE COUNTY OF SUSSEX.
Superior Court of New Jersey, Appellate Division.
Argued July 9, 1974.
Decided July 12, 1974.
*297 Before Judges FRITZ, LYNCH and MICHELS.
Mr. Craig U. Dana argued the cause for appellant Harry C. Wright (Messrs. Morris, Downing & Sherred, attorneys; Mr. David L. Jubanowsky, on the brief).
Mr. Emanuel A. Honig argued the cause for petitioners-respondents (Messrs. Honig and Honig, attorneys; Mr. Richard E. Honig, on the brief).
The opinion of the court was delivered by FRITZ, J.A.D.
At issue in this election dispute is whether 294 write-in votes for a candidate for council in Sparta Township should be counted for Harry C. Wright, an active candidate for the office, as the board of canvassers and county board of elections decided, or should be disregarded, as the judge below determined, because they were voted only for "Wright" or "Mr. Wright" and without a first name or initial.
The facts are undisputed. The final results of the election, held May 14, 1974, (after a recount) were certified according to the following tabulation: George Dykstra, 1,744; Richard Hunsicker, 1,523; Harry Wright, 1,193; Joan M. Flanagan, 1,161; Charles Fletcher, 1,022; all others, 53. Among the "others" were votes for C. Wright, 3; George Wright, 4; Frank Wright, 1; Charles Wright, 1; W. Wright, 1; Richard Wright, 1; Henry Wright, 1; and Harry R---t [sic], 1. Since there were three vacancies, Dykstra, Hunsicker and Harry Wright were declared the winners.
The remaining significant facts can be readily synthesized: Other than Harry C. Wright and his wife, there are eight registered voters in the township whose last name is Wright. *298 There is no record among the registered voters in the township of any named Frank, Richard, Henry, George or William Wright. Nobody in the township named Wright campaigned for the office except Harry Wright. There is no suggestion in the record that any Wright other than Harry sought the office or, indeed, authorized a candidacy, either directly or indirectly.
On the other hand, Harry Wright campaigned vigorously for a write-in vote, from the day he was denied a place on the printed ballot when his nominating petitions were held to be untimely filed, through an unsuccessful application to the courts to be permitted to use stickers, up to the day of the election. His picture appeared, with that of the other four candidates whose names appeared on the ballot, in a leading newspaper article on Sunday two days prior to the election. Most significantly, he campaiged in tandem with Dykstra and Hunsicker, in opposition to Flanagan and Fletcher. The campaign advertising of Dykstra and Hunsicker inevitably embraced Wright in the coalition. It would appear that in none of the political advertising did Dykstra and Hunsicker join without equal billing for Harry Wright. A published "open letter" endorsement by the state senator from the 15th Legislative District extolled "the qualifications and stated aims of the candidates" Hunsicker, Dykstra and Harry Wright, describing the challenge facing the latter as "probably the most difficult" because he was a write-in candidate. Unfortunately, Harry Wright's campaign suggested, on frequent occasions, the mnemonic, "Write in Wright."
In such circumstances we are persuaded beyond any doubt that the characterization by the trial judge of the questioned 294 votes as "ambiguous" and their allocation to Harry Wright as "arbitrary" disregards the real world practicality of the situation.
There is evidence of four write-in votes cast for George Wright, concededly not registered in Sparta. There is evidence of three such votes for C. Wright and one vote for Charles Wright. None other of the Wrights (or R---t) received *299 more than one vote. Petitioners argue that one vote constitutes its recipient a candidate.[1] No authority is offered for this dogma. We reject the argument as an absolute proposition because the ultimate conclusion as to candidacy vel non depends so intimately on the circumstances of a given case. We can contrive hypotheses in which one vote might well constitute its recipient a candidate. The converse is as easily conceived. Here concededly no Wright other than Harry sought the office. There is no suggestion whatsoever (leaving aside the 294 votes for the moment) that any of the other Wrights was the subject of any elective desire beyond an isolated wayward expression, a self-cast vote, or a prank. Accordingly we find the statement of the court below that "This is certainly not a case where there is only one candidate for the office in question whose surname is the same or essentially the same as the one written-in by the voter," one with which we cannot concur, which we believe is unsupported in the record, and which, in our judgment, ignores the hard realities of the situation.
No evidence whatsoever appears of more than that lonely one (or not more than four in the case of George, the ineligible) vote for any Wright other than Harry (still leaving aside for the moment the 294 votes). In these circumstances we decline to share the apparent concern of the trial judge that some of the 294 votes must necessarily have been meant for the "other" Wrights. We are persuaded that in the situation here the probability almost to a certainty is that those intending to cast the isolated vote for one other than Harry Wright identified their selection by something other than a surname in view of the "Write-in Wright" campaign. It is far more likely that some of the "other" Wright votes (not counted for Harry) were in fact cast for him than it is that any of the 294 were for one other than him.
*300 A number of earlier cases[2] dealing with the absence or abridgement of given names need no longer be considered in view of the enactment of L. 1930, c. 187, par. 205, to be found now in N.J.S.A. 19:16-4 in which the following appears:
No ballot cast for any candidate shall be invalid by reason of the fact that the name of such candidate may be misprinted, or his Christian name or his initials may be omitted.
No ballot cast for any candidate shall be invalid by reason of the use of any paster permitted by this Title on which the title of office may be printed or the name of such candidate may be misprinted or part of his Christian or surname or initials may be omitted, or because the voter in writing the name of such candidate may misspell the same or omit part of his Christian name or surname or initials.
Clearly, the Legislature has mandated a search for the real intention of the voter no matter how crudely it is expressed, provided only, of course, that there is a reasonable expression of that intent on the ballot. In re Klayman, 97 N.J. Super. 295 (Law Div. 1967). We correctly strive to prevent disenfranchisement, abhorred in the law. In re Keogh-Dwyer, 106 N.J. Super. 567, 576 (Law Div. 1969), aff'd o.b. 54 N.J. 523 (1969); In re Klayman, supra.
Further, we have matured beyond the holding of Weeks v. Kip, 64 N.J.L. 61 (Sup. Ct. 1899), suggesting that the intent of the voter may not be gleaned from extrinsic evidence. To be sure there must be an expression of intent on the ballot, but the ballot is to be read in the light of surrounding circumstances, evidence of which is admissible. Gulino v. Cerny, 13 Ill.2d 244, 148 N.E.2d 724 (Sup. Ct. 1958); see generally 26 Am. Jur.2d, Elections, § 271 at 98.
Varying extrinsic factors have been considered by the courts in searching for the voter's intent. Whether there are *301 other candidates of the same name is one of these, as is the extent and vigor of the campaign carried on by the contestant in its likelihood of bringing his name to the attention of the voters. Beck v. Cousins, 252 Iowa 194, 106 N.W.2d 584 (Sup. Ct. 1960). In a word, reliable evidence which, in the light of human experience might reasonably be expected to demonstrate intent expressed on the ballot but less than perfectly, should be searched to effectuate the voter's wish and preserve the franchise.
The judge below correctly noted the rule by observing that "the amount of notoriety which accompanies a candidate's campaign may be considered in determining the intention of the ambiguous ballot." We believe he erred in at least three respects, however, in his implied view that to assign these 294 votes to Harry Wright "merely because he campaigned more vigorously than other `Wrights'" (emphasis added) constituted arbitrary and illegal action. First, Harry Wright indeed campaigned more vigorously than "other `Wrights'" because no other Wrights campaigned at all. To the extent this expression implies there were other campaigning Wrights it is entirely unsupported by the record. Second, read in context, the statement supports as a conclusion of the trial judge that there were in fact other Wright candidates. As related above, we do not equate the casual vote  or even four  with candidacy. We are of the opinion that the record supports the conclusion that there was only one candidate named Wright  Harry Wright  and that any other conclusion is unsupported by the record. Finally, we are of the judgment that under the particular circumstances of this case, including the nature of the campaign and the fact that Harry Wright's teammates finished first and second, the "mere" circumstance of the unique campaign activity and coalition might well serve by itself as ample to demonstrate the intent of these 294 voters to vote for Harry Wright. Coupled with the absence of any other Wright campaign and the sparseness to the disappearing point of *302 votes for any other named (or initialled) Wright, we are firmly convinced that all of these 294 votes were intended for Harry Wright. See Gulino v. Cerny, supra; Beck v. Cousins, supra; Appeal of McCracken, 370 Pa. 562, 88 A.2d 787 (Sup. Ct. 1952); Annotation, "Validity of write-in vote where candidate's surname only is written in on ballot," 86 A.L.R.2d 1025 (1962).
The case before us presents a remarkable similarity to that considered in Dupin v. Sullivan, 355 S.W.2d 676 (Ky. Ct. App. 1962), where an election turned on the validity of write-in votes bearing only a surname, the write-in candidates having been active campaigners. While the case can be distinguished on the ground that nothing in the opinion speaks of others in the community with the same name as the write-in candidates (but they "were the only ones by those names who were active contestants for election"), and we have doubt with regard to the expression there that it was necessary for the dissidents to identify the voters who cast the bad votes (but see Application of Murphy, 101 N.J. Super. 163 (App. Div. 1968), certif. den. 52 N.J. 172 (1968), noting exception at 101 N.J. Super. 168), we share the obvious expression therein of the imposing significance of the campaign activity. As was held in similar context in Appeal of McCracken, supra, that which "common sense and the obvious facts dictate" must not be ignored by a relegation of vote counting to "a humanized adding machine." (88 A.2d at 788.)
The standard to be applied is not one of absolute sureness. Reasonable certainty is enough. Petition of Wade, 39 N.J. Super. 520 (App. Div. 1956). Here our conviction far exceeds this minimum.
State v. Johnson, 42 N.J. 146 (1964) is apposite. There the following appears:
But if the appellate tribunal is thoroughly satisfied that the finding is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction * * *, then, and only then, it should appraise the record as if it were deciding the *303 matter at inception and make its own findings and conclusions. While this feeling of "wrongness" is difficult to define, because it involves the reaction of trained judges in the light of their judicial and human experience, it can well be said that that which must exist in the reviewing mind is a definite conviction that the judge went so wide of the mark, a mistake must have been made. This sense of "wrongness" can arise in numerous ways  from manifest lack of inherently credible evidence to support the finding, obvious overlooking or undervaluation of crucial evidence, a clearly unjust result, and many others. This, then, is when and how the permissive power of R.R. 1:5-4(b) should be utilized by the first appellate tribunal and is what our prior cases mean no matter how they have expressed it. [at 162]
In this matter we hold to a "definite conviction that the judge went so wide of the mark, a mistake must have been made." We experience the feeling of wrongness, the sense of the unjust result. Dolson v. Anastasia, 55 N.J. 2 (1969).
We reverse and enter judgment declaring Harry Wright elected.
NOTES
[1] The word comes from the Latin candidatus and this from the white toga worn by those in ancient Rome who sought after an office. Webster's Third New International Dictionary, 325 (1971).
[2] State ex rel. O'Brien v. Bayonne Board of Councilmen, 30 A. 430 (Sup. Ct. 1894; not officially reported); Weeks v. Kip, 64 N.J.L. 61 (Sup. Ct. 1899); Davis v. Bell, 27 N.J.L.J. 76 (Cir. Ct. 1904; not officially reported).