753 A.2d 1101

IN THE MATTER OF THE PETITION OF KATI GRAY–SADLER,
JOHN STURGIS AND EDWARD GEIGER, WRITE–IN CANDI-
DATES FOR THE OFFICES OF MAYOR AND BOROUGH
COUNCIL OF CHESILHURST BOROUGH, CONTESTING THE
RESULTS OF THE GENERAL ELECTION OF NOVEMBER 2,
1999.

Argued May 1, 2000—Decided June 30, 2000.

*Shirley Grasso* argued the cause for appellants and cross-respondents Kati Gray–Sadler, John Sturgis and Edward Geiger (*Grasso & Inferrera,* attorneys).

*Robert G. Millenky,* Camden County Counsel, argued the cause for respondent and cross-appellant County of Camden.

*Donna Kelly,* Senior Deputy Attorney General, argued the cause for respondents and cross-appellants Camden County Superintendent of Elections and Camden County Board of Elections

(*John J. Farmer, Jr.*, Attorney General of New Jersey, attorney; *Mark J. Fleming*, Assistant Attorney General, of counsel; *Ms. Kelly* and *Karen Griffin*, Deputy Attorney General, on the briefs).

*John B. Kearney* argued the cause for respondent and cross-respondent Arland Poindexter (*Kearney & Castillo*, attorneys, *Carol R. Cobb*, on the brief).

*David E. Mapp* argued the cause for respondent and cross-respondent Borough of Chesilhurst (*Harvey C. Johnson*, attorney).

The opinion of the Court was delivered by

PORITZ, C.J.

In this appeal, write-in candidates for the offices of mayor and borough council in the Borough of Chesilhurst challenge the results of the November 2, 1999, general election. After hearing testimony and reviewing the voting rolls, the Law Division ruled that irregularities related to the write-in instructions and non-compliant voting machines required the election results for those offices to be set aside. The court ordered a special election to fill the resulting vacancies. The Appellate Division reversed.

We now reinstate the decision of the trial court, with certain modifications, and order that a special election be held.

**I**

Chesilhurst is a small town in Camden County with 880 registered voters. Four-hundred-eleven of those voters participated in the 1999 election for the offices of general assembly, county freeholder, mayor, and borough council. The election took place at a single polling location with two voting machines rented from Camden County. Those machines were older models that use paper rolls to record write-in votes.

Among the candidates for local office were three individuals who ran a spirited write-in campaign—Kati Gray–Sadler for mayor, John Sturgis for councilman, and Edward Geiger, also for council-

man. The other candidates for those offices, Mayor Arland Poindexter, Jr., Councilman Bernard Congleton, and Councilman Ralph Johnson, were incumbents and were the only candidates whose names appeared on the voting machine ballot for mayor and borough council. To vote for a write-in candidate, a voter was required to hold down a lever with one hand, simultaneously slide open a metal window next to the appropriate office with the other hand, and then insert the name of the desired candidate in writing or with a sticker on the paper revealed in the open window.

Prior to the election, voters received sample ballots that depicted the face of the voting machine. In addition, petitioners distributed pre-printed stickers bearing the write-in candidates' names, together with information about their backgrounds and platforms. No information about how to cast a write-in vote was available at the polling place prior to entering the voting machines.

Inside the voting machines, the face of the ballot contained the following instruction in minute lettering placed in the top left corner: "PERSONAL CHOICE WARNING! Do not touch personal choice unless you intend to write in. Ask Election Judge for instructions before entering machine to vote."[1] On the ballot, there were seven lines for each of the available offices (one for mayor and two each for general assembly, county freeholder, and borough council) and forty-three extra blank lines. On the left wall of the voting booths, a poster provided separate instructions that read:

To vote for a candidate of your personal choice, place finger of left hand on small lever indicated. Pull lever to right, this will release window slides.

Pull to right the window slide of the designated office for which you desire to cast your vote. Paper will then be exposed for your write-in vote.

You must place an X after written name. It is also permissible to attach a sticker to the paper with a candidates [sic] name plus the X.

---

[1] Respondents contend that the personal choice warning was only on the sample ballot and not on the face of the machine. However, the trial court found testimony that the warning was on the face of the machine to be credible. We have no basis for questioning that finding.

The written instructions were accompanied by a photograph of two hands, one pointing to the small lever and the other to a metal window.

The initial election return sheet indicated that Poindexter received 164 votes for mayor and Gray–Sadler received 146 votes. With the addition of absentee and provisional ballots, Poindexter's total rose to 172 and Gray–Sadler's to 154. After a recount of the paper rolls, Gray–Sadler's total vote count was decreased from 154 to 152. The return sheet showed that incumbent Councilmen Congleton and Johnson received 166 and 164 votes, respectively, whereas write-in candidates Sturgis and Geiger received 123 and 113 votes. After the recount and the addition of absentee ballots, Sturgis's final total was 135 and Geiger's was 134.

On December 3, 1999, petitioners filed a complaint challenging the election results essentially on the grounds that the write-in instructions were confusing and that the voting machines had scraped off certain write-in stickers, a claim not raised before this Court. The trial court conducted a hearing in which the Borough of Chesilhurst and the Attorney General's Office, on behalf of the Camden County Board of Elections and the Camden County Superintendent of Elections, defended the results. Six witnesses testified for petitioners and all claimed that they had had difficulty in determining how to cast a write-in vote because the instructions were sparse and confusing. One witness testified that the confusion was so great it actually prevented her from casting a write-in vote, and another testified that she lost the opportunity to vote when she stepped out of the booth to ask an election official for instructions about write-in votes. The Board of Elections also disclosed for the first time that it had rejected votes, contrary to both the notation on the return sheet that no votes were rejected and the silence of the recount report concerning rejected votes.

The trial court subsequently ordered a review of the paper rolls and discovered that there were sixty-four write-in votes, either hand-written or affixed by sticker, that had not been counted by election officials. Forty-nine were placed on the voting machine in

spaces that did not specify any office. Of those forty-nine, fifteen votes were for Gray–Sadler, nineteen for Sturgis, and fifteen for Geiger. The Board deemed those forty-nine votes void. Another fifteen votes were placed in spaces designated for offices that were not sought by petitioners (e.g., Gray–Sadler was placed twice in general assembly spaces and six times in borough council spaces). Those votes were counted as votes for those offices, not the offices for which petitioners were running.

The trial court concluded that serious irregularities in the conduct of the election denied qualified write-in voters their "constitutional right to vote for any person they chose." Because the voting machines were not accompanied by proper mechanical models, as specified in *N.J.S.A.* 19:48–1($l$), and because voting instructions were not provided to each voter in the manner required by *N.J.S.A.* 19:50–3, the court voided the results for the offices of mayor and borough council and ordered a special election to be held. On emergency appeal, the Appellate Division reversed. We granted petitioners' request for certification and cross-petitions filed by Camden County and the Attorney General in respect of the appropriate procedures in the event of a new election. 163 *N.J.* 398, 749 *A.2d* 371 (2000).

## II

A citizen's constitutional right to vote for the candidate of his or her choice necessarily includes the corollary right to have that vote counted " 'at full value without dilution or discount.' " *Reynolds v. Sims,* 377 *U.S.* 533, 555 n. 29, 84 *S.Ct.* 1362, 1378 n. 29, 12 *L.Ed.2d* 506, 524 n. 29 (1964) (quoting *South v. Peters,* 339 *U.S.* 276, 279, 70 *S.Ct.* 641, 643, 94 *L.Ed.* 834, 838 (1950) (Douglas, J., dissenting)). That principle also encompasses "the right of all qualified electors to vote for [a write-in candidate] by such means." *Sadloch v. Allan,* 25 *N.J.* 118, 128, 135 *A.2d* 173 (1957); *see also Stevenson v. Gilfert,* 13 *N.J.* 496, 503–04, 100 *A.2d* 490 (1953) (discussing right to cast write-in vote for any person). To preserve those rights, our state election laws are designed to deter

fraud, safeguard the secrecy of the ballot, and prevent disenfranchisement of qualified voters. *Cf. In re Byron,* 165 *N.J.Super.* 468, 474, 398 *A.*2d 599 (Law Div.1978) (concerning purpose of election laws in relation to absentee ballots), *aff'd,* 170 *N.J.Super.* 410, 406 *A.*2d 982 (App.Div.), *certif. denied,* 82 *N.J.* 280, 412 *A.*2d 786 (1979). In furtherance of those goals, we have held that it is our duty to construe elections laws liberally. *See Wene v. Meyner,* 13 *N.J.* 185, 197, 98 *A.*2d 573 (1953) (citing Chief Justice Vanderbilt's opinion in *Kilmurray v. Gilfert,* 10 *N.J.* 435, 440, 91 *A.*2d 865 (1952)).

### A.

Among the grounds for contesting an election set forth in *N.J.S.A.* 19:29–1, subsections (e), (f), and (g) are applicable to this appeal. Those subsections provide, in relevant part, that voters may challenge an election,

e. When ... legal votes [have been] rejected at the polls sufficient to change the result;

f. For any error by any board of canvassers in counting the votes or declaring the result of the election, if such error would change the result; [or]

g. For any other cause which shows that another was the person legally elected.

All three petitioners claim that write-in votes placed on the wrong line due to insufficient and unintelligible instructions were ignored or counted as votes for offices that the candidates were not seeking. They also claim that the inadequate instructions prevented other voters from casting any write-in votes at all. The gravamen of those claims is that legal votes cast for the petitioners were "rejected." *See N.J.S.A.* 19:29–1(e).

Petitioners' reading of the term "rejected" is supported by prior caselaw that defines the term " 'to include any situation in which qualified voters are denied access to the polls.' " *In re 1984 Maple Shade Gen. Election,* 203 *N.J.Super.* 563, 590, 497 *A.*2d 577 (Law 1985) (quoting *Magura v. Smith,* 131 *N.J.Super.* 395, 399, 330 *A.*2d 52 (Law Div.1974), *overruled in part on other grounds, In re Mallon,* 232 *N.J.Super.* 249, 271, 556 *A.*2d 1271 (App.Div.), *certif. denied,* 117 *N.J.* 166, 564 *A.*2d 883 (1989)); *accord In re*

*Moffat*, 142 *N.J.Super.* 217, 223, 361 *A*.2d 74 (App.Div.) (holding that votes "rejected" when partially malfunctioning voting machine prevented recording of votes for one candidate), *certif. denied,* 71 *N.J.* 527, 366 *A*.2d 682 (1976). Voters need not be physically barred from voting to have their votes rejected, but may instead show that, through no fault of their own, they were prohibited from voting for a specific candidate by some irregularity in the voting procedures. *In re Moffat, supra,* 142 *N.J.Super.* at 223, 361 *A*.2d 74. The essential question is whether voters were denied the opportunity to vote for a candidate of their choice. *Ibid.*

■ Respondents admit that many write-in votes were ignored because they were placed on the wrong line. They argue, however, that *N.J.S.A.* 19:49–5 required election officials to reject those votes, based on a plain reading of the statute, which states that if a write-in vote, or "irregular ballot," is not "in its appropriate place on the [voting] machine, ... it shall be void and not counted."

Although the statute appears straightforward, it must be read in light of the broad purpose of the election laws to prevent disenfranchisement of qualified voters. In cases involving invalidated write-in votes, our courts have distinguished errors due to extrinsic problems from errors caused by a voter's own neglect. *In re Hartnett,* 163 *N.J.Super.* 257, 268, 394 *A*.2d 871 (App.Div.1978) (holding that vote properly voided where intent was clear but error was within voter's control); *In re Fifteen Registered Voters on Behalf of Flanagan,* 129 *N.J.Super.* 296, 301–02, 323 *A*.2d 521 (App.Div.) (holding that write-in votes bearing only surname should not have been voided where desired candidate was obvious and voter sufficiently complied with instructions), *certif. denied,* 65 *N.J.* 577, 325 *A*.2d 711 (1974); *In re Klayman,* 97 *N.J.Super.* 295, 304, 235 *A*.2d 45 (Law Div.1967) (holding that incorrect spelling or absence of middle initial should not void write-in vote where intent clear and write-in space small); *but see In re Sweetwood,* 91 *N.J.Super.* 496, 499, 221 *A*.2d 543 (App.Div.1966) (holding that

although ballot did not instruct voter to designate office for selected candidate, failure to do so invalidated vote). Those cases generally adhere to the principle that rigid application of technical rules should not prevent otherwise valid write-in votes from being counted. *See Riecker v. Hartmann,* 130 *N.J.Super.* 266, 272, 326 *A.*2d 101 (Law Div.1974) (stating that "the technical restraints of the election laws" should not restrict voters' will).

■ We do not believe that the Legislature intended *N.J.S.A.* 19:49–5 to be applied in a manner that would frustrate the free expression of the voters' will when the incorrect placement of the write-in vote is the result of mistakes or problems beyond the voters' control. To determine the nature of any alleged mistakes or problems and their impact on the voters, we consider extrinsic factors such as the notoriety of the candidates' campaign and the character of the electorate. *See In re Fifteen Voters, supra,* 129 *N.J.Super.* at 300–01, 323 *A.*2d 521. Reliable extrinsic evidence, "which, in light of human experience might reasonably be expected to demonstrate intent expressed on the ballot but less than perfectly, should be searched to effectuate the voter's wish and preserve the franchise." *Id.* at 301, 323 *A.*2d 521.

We observe, in the case before us, that this was a small election in a small borough with only seven offices to be filled. Like Harry Wright, the candidate for office in *In re Fifteen Voters,* petitioners campaigned vigorously for write-in votes and sent publicity mailings to all of the registered voters in the borough. Petitioners also campaigned together in opposition to the incumbent candidates and made it quite clear that they were running as a mayor/council team. *Cf. id.* at 298, 323 *A.*2d 521 (noting joint campaign of write-in candidate and other candidates). On the paper rolls, many of the voided votes were cast in groups of three, but on lines just above or just below the designated spaces. The only reasonable conclusion to be drawn from those groupings is that the intention of the voters who cast those votes was to elect Gray–Sadler for mayor, and Sturgis and Geiger for borough council.

The voters who used stickers had taken the trouble to bring them to the voting booth and to attempt to affix them in the proper place. It defies common sense to imagine that those voters entered the voting machines with any intent other than to elect the candidates named on the stickers to the offices for which they were running. To disregard those votes would run counter to the purpose of our inquiry—to search for the real intention of the voter "no matter how crudely it is expressed, provided only, of course, that there is a reasonable expression of that intent on the ballot." *Id.* at 300, 323 *A.2d* 521.

Recognizing the voters' intent, we must ask why write-in votes were placed on the wrong lines or not cast in the first place. The answer to that question should help us to determine whether the "rejected" voters had their votes invalidated as a result of their own errors or as a result of election officials' noncompliance with statutory requirements. *See, e.g., Kirk v. French,* 324 *N.J.Super.* 548, 554, 736 *A.2d* 546 (Law Div.1998) (distinguishing extrinsic cause of rejection from voter's refusal to comply with simple, reasonable, and normal requirement designed to assure honest voting). In fact, the record illustrates a failure to comply with *N.J.S.A.* 19:50–3, which directs election officials to instruct voters on the proper use of voting machines. The instructions should have been "carefully drawn so as to fully advise the voter as to the proper procedure he [or she] is to follow." *In re Sweetwood, supra,* 91 *N.J.Super.* at 500, 221 *A.2d* 543. Indeed, the statute requires that a mechanical model be provided, if practicable, to illustrate how to operate the actual machine and to afford voters an opportunity to practice on the model. *N.J.S.A.* 19:50–3; *see also N.J.S.A.* 19:48–1(*l*) (requiring mechanical model). It also requires that "[t]he voter's attention ... be called to [a] diagram of the face of the machine so that the voter can become familiar with the location of the questions and the names of the officers and candidates." *N.J.S.A.* 19:50–3.

During the Chesilhurst election, no information was provided outside the voting booths explaining how properly to cast write-in

votes. Voters seeing conflicting and incomplete instructions for the first time on entering the booths were understandably confused, and their confusion is attributable to defects outside of their control. The testimony at the hearing indicated that voters who made a sincere effort to cast a write-in vote were thwarted by the limited and deficient instructions provided inside the booths. For example, one voter, Bernadette Freeman, testified that she wished to cast write-in votes for Gray–Sadler, Sturgis, and Geiger, but followed the personal choice "warning" and stepped out of the booth to ask an election official for instructions. When she spoke with an official, the official entered the voting machine and pulled the lever to enter Ms. Freeman's votes before she was finished voting.[2] Even if she had been allowed to re-enter the booth and continue voting, Ms. Freeman would not have found an adequate explanation of the personal choice procedures in the polling place.

Under the heading "INSTRUCTIONS TO VOTERS" at the top of the ballot, there were clear, legible step-by-step instructions on how to vote for the candidates printed on the ballot, illustrated by two separate diagrams showing how to push the voting switch. No mention of how to cast a write-in vote was included in those instructions. By contrast, the personal choice warning was printed in difficult-to-read type and located in a corner space one point five centimeters wide and two centimeters high on the far left side of the ballot. It was both easy to miss and difficult to read, and, most important, instructed voters to seek assistance from an official outside the booth. Anyone who followed that direction would be barred from re-entering the voting machine after having been given instructions, as was Ms. Freeman.

The warning also indicated to voters that they had to "touch personal choice" to register a write-in vote. However, no personal choice button or switch was on the machine. Rather, personal choice could be entered only by means of a complicated series of

---

[2] Under *N.J.S.A.* 19:52–3, a voter may not exit the voting booth and then re-enter; once the voter exits, his or her vote is cast and cannot be amended.

actions. Finally, the wording on the machine ("Personal Choice Warning! Do not touch personal choice unless you intend to write in") likely led voters to be unduly cautious about pressing any personal choice apparatus without first consulting with an official. Overall, it was considerably easier to vote for candidates whose names were printed on the ballot as opposed to write-in candidates, regardless of the voters' preferences.

As for the poster on the left wall of the voting machine, it provided more detailed instructions but omitted a critical piece of information. The poster indicated that, to cast a write-in vote, a voter must pull a small lever and then pull the window slide; it did *not* state that both the lever and the slide had to be pulled at the same time. Unless there was simultaneous action by the voter, the window would not slide open. There was a picture on the poster, but it also failed to indicate the need to simultaneously work the levers, and was, as the trial court found, "at once confusing, ambiguous and incomplete." Thus, it is likely that voters pressed the lever, let go, and then tried to slide the window, only to find that the window would not budge. That could explain why eighty-three voters entered the voting machine for a mayoral election but did not cast a vote for mayor. It is also likely that voters tried to open different windows after an unsuccessful first try, and then cast their write-in votes on the first window that would open, even if it was not the proper window.

Those defects may not have been so troubling had there been clear instructions prominently posted outside the voting machines in the polling area or models to demonstrate how the voting machine worked. Unfortunately, no instructions were provided in the polling place other than inside the voting machines. Moreover, the sample ballots sent to voters prior to the election lacked clear information about how to cast a write-in vote. The sample ballot looked substantially the same as the face of the voting machine and thus raised the same issues we have discussed in connection with the personal choice warning on the voting machine ballot. The sample ballot is even more confusing because it does

not indicate that there are windows next to each office on which to cast write-in votes. On the face of the sample, there is no space for a write-in vote to be placed, nor is there any indication that there is a small lever on the machine that must be pulled to release the windows.

This case is readily distinguishable from other cases in which voters' failure to comply with specific procedural instructions invalidated their votes. See *In re Municipal Election Held on May 10, 1994*, 139 *N.J.* 553, 558, 656 *A.*2d 5 (1995); *In re Keogh–Dwyer*, 45 *N.J.* 117, 120, 211 *A.*2d 778 (1965). In those other cases, voters were clearly and unambiguously instructed to punch or mark the ballot in a designated box next to the candidate's name and warned that if the marking was not made, the ballot would not be counted. Similarly clear instructions were not provided to the Chesilhurst voters; rather, they were given patently inadequate instructions or none at all. More analogous are the cases that discuss the provision of defective voting machines. *Cf. In re Maple Shade, supra*, 203 *N.J.Super.* at 585, 497 *A.*2d 577 (finding error when voting machines broke down and officials failed to offer all voters paper ballots); *In re Moffat, supra*, 142 *N.J.Super.* at 222, 361 *A.*2d 74 (noting that voting machine counter became disengaged during election); *Magura, supra*, 131 *N.J.Super.* at 397, 330 *A.*2d 52 (noting mechanical breakdown of voting machines). There, voters, through no fault of their own, are rendered incapable of recording their preferences for candidates on the voting machines. Whether the barrier is created by a defective machine, or the failure of election officials to provide adequate personal choice instructions, is of little importance. In the end, qualified voters have been disenfranchised.

**B.**

Whether petitioners may prevail on their *N.J.S.A.* 19:29–1(e) claim depends on whether the "rejected" votes were sufficient to change the result. In essence, the Court must decide, under the totality of the circumstances, whether the election

irregularities were so significant as to warrant a new election. Simple deviance from statutory election procedures, absent fraud or malconduct, will not vitiate an election unless those contesting it can show that as a result of irregularities "the free expression of the popular will in all human likelihood has been thwarted." *Wene, supra,* 13 *N.J.* at 196, 98 *A.2d* 573; *see also In re Hackensack Recall Election,* 31 *N.J.* 592, 595, 158 *A.2d* 505 (1960) (holding that if election results unaffected by alleged error, election should not be overturned). Only when those irregularities "are such that the court cannot with reasonable certainty determine who received the majority of the legal vote," can a court set aside an election. *In re Mallon, supra,* 232 *N.J.Super.* at 270, 556 *A.2d* 1271; *In re Bonsanto's Application,* 171 *N.J.Super.* 356, 360, 409 *A.2d* 290 (App.Div.1979).

 In undertaking this analysis our

"courts [have] consider[ed] the nature of the irregularity, its materiality, the significance of its influence and consequential derivations in order to determine whether the digression or deviation from the prescribed statutory requisitions had in reasonable probability so imposing and so vital an influence on the election proceeding as to have repressed or contravened a full and free expression of the popular will...."

[*In re Mallon, supra,* 232 *N.J.Super.* at 270, 556 *A.2d* 1271 (quoting *Sharrock v. Borough of Keansburg,* 15 *N.J.Super.* 11, 17, 83 *A.2d* 11 (App.Div.1951)).]

At the heart of the inquiry is the need to safeguard the franchise of not only the voters who cast valid votes at the election, but also those whose votes were rejected. See *Sharrock, supra,* 15 *N.J.Super.* at 19, 83 *A.2d* 11. If the irregularities are found to have been so serious as to prejudice the election result, *N.J.S.A.* 19:29–9 requires the election to be set aside, the results declared null and void, and a special election held.

 Gray–Sadler satisfies this test because the total votes cast for her, on both the correct and incorrect lines, exceeds the total cast votes for Poindexter. The inquiry is more difficult for Sturgis and Geiger, however, because they cannot prove that votes *not cast* due to the problematic personal choice instructions would have been cast for them. Because we cannot require them to

prove to a certainty how the rejected voters would have voted, they need only show that enough qualified voters were denied the right to cast write-in votes to affect the outcome of the election. *See In re Maple Shade, supra,* 203 *N.J.Super.* at 589, 497 *A.*2d 577; *In re Moffat, supra,* 142 *N.J.Super.* at 225, 361 *A.*2d 74. Petitioners' burden may be met "by a demonstration that had the votes been cast for [them], the result would have been different." *In re Moffat, supra,* 142 *N.J.Super.* at 224, 361 *A.*2d 74. The standard we apply is one of reasonable certainty as opposed to absolute certitude. *In re Fifteen Voters, supra,* 129 *N.J.Super.* at 302, 323 *A.*2d 521.

The Official Board of Canvassers Report dated November 2, 1999, indicates that eighty-three people entered the voting booth and did not cast a vote for mayor, and that 215 votes that could have been cast for borough council were not cast. Although some voters may have simply decided not to vote for those offices, there is a strong possibility that enough of those "missing votes" were not cast because of the confusing personal choice instructions. *Cf. In re Moffat, supra,* 142 *N.J.Super.* at 225–26, 361 *A.*2d 74 (finding that discrepancy between number of persons who used malfunctioning voting machines and votes for sole open office suggested certain votes rejected). One witness testified to that effect, and other witnesses corroborated how difficult it was to cast a write-in vote even though those voters ultimately were able to do so.

Although it would have been preferable to have more voters testify at the hearing, we recognize that concerns about privacy, embarrassment, and ridicule may prevent voters from coming forward to offer testimony that they did not vote because they could not understand the instructions. *See id.* at 225, 361 *A.*2d 74; *In re Klayman, supra,* 97 *N.J.Super.* at 299, 235 *A.*2d 45. Because Sturgis and Geiger would have lost by about only ten votes if the voided write-in votes were counted, only a small number of the "missing" votes would have changed the election. Accordingly, we conclude that Sturgis and Geiger also meet the statutory

requirement for successfully contesting the results of the council election.[3]

### III

In light of all the circumstances, we cannot determine with reasonable certainty those candidates who received a majority of the votes for either the mayor or borough council seats. See *In re Fifteen Voters, supra,* 129 *N.J.Super.* at 302, 323 *A.2d* 521. Therefore, we declare the election for the offices of mayor and borough council null and void. A special election must be held to fill the resulting vacancies "not less than 45 days nor more than 50 days" from the effective date of this opinion. *N.J.S.A.* 40A:16–16. The Camden County Clerk must, at least thirty days preceding the election, make the necessary arrangements with the postmaster to have sample ballots mailed, and notify the commissioner of registration in writing to that effect. *N.J.S.A.* 19:49–4(c). The election must be conducted as it was on the original election day, except that there must be adequate instructions as outlined below and the election will be limited to the offices of mayor and borough council. *N.J.S.A.* 19:27–1. Petitioners' names will not appear on the face of the ballot and they will not have a new opportunity to petition to have their names placed on the ballot as they did not earlier comply with *N.J.S.A.* 19:13–3 or *N.J.S.A.* 19:14–2.1.

For the new election, and for all future elections throughout the state, explicit instructions on how to cast a write-in vote must be provided with the sample ballots sent to registered voters. The instructions must offer clear, step-by-step directions that describe the mechanics of the voting machine, explain how to operate the windows and levers, and emphasize the need to cast write-in votes on the appropriate lines. Voters must be warned that an improperly cast vote will be deemed void.

---

[3] Since petitioners have demonstrated that "legal votes [have been] rejected at the polls sufficient to change the result," *N.J.S.A.* 19:29–1(e), we need not decide whether further grounds exist to contest the election.

Similarly clear and informative instructions must be provided at the polling place. Election officials must prominently display *outside* the voting machines a copy of the reformulated poster explaining personal choice that is located inside the voting booth. As a general rule, any of the instructions contained inside the voting machines should be displayed outside the voting machines so that voters have an opportunity to read the instructions in advance and pose any questions they may have to the election officials.

■ It is preferred that a mechanical model and/or demonstration voting machine be available to instruct voters, but unlike the voting instructions, they are not absolutely required. Although *N.J.S.A.* 19:48-1(*l*) states that all voting machines "shall be provided with a mechanical model, illustrating the manner of voting on the machine, suitable for the instruction of voters," *N.J.S.A.* 19:50-3 adds that the model must be provided only if "practicable." When interpreting different statutory provisions, we are obligated to make every effort to harmonize them, even if they are in apparent conflict. *State v. Federanko,* 26 *N.J.* 119, 130, 139 *A.*2d 30 (1958); *Builders League of South Jersey, Inc. v. Pine Hill,* 286 *N.J.Super.* 348, 352, 669 *A.*2d 279 (App.Div.1996). Reading those provisions *in pari materia,* we conclude that the latter modifies the former to require the provision of a model only when it will not be a heavy burden on the locality. Consequently, if the Borough of Chesilhurst has difficulty in procuring either an accurate and complete mechanical model or a demonstration voting machine, it need not provide those aids.

For this election, however, there is only one polling place with two voting machines. Thus, providing an extra machine for instructional purposes is not likely to be an undue burden. Respondents concede that the extra machine is feasible here, but express concern about the cost of extra machines in future elections when multiple polling places are used. We do not require that there be an extra voting machine for future elections, but rather that an extra machine be provided when a mechanical

model is unavailable and the extra machine would not be a great burden to obtain.

Chesilhurst argues that Camden County should be responsible for the costs of the special election because the county breached its contract to provide Chesilhurst with legally compliant voting machines, election workers, and printed ballots. See *N.J.S.A.* 19:8–6, 19:48–3.17, 19:48–3.18 (providing that local municipalities rent voting machines, personnel, and ballots from the county). After oral argument we were informed by counsel for Camden County that a new election in Chesilhurst would cost approximately $9,000. We agree with the trial court that, in these circumstances, Camden County should fund the costs of the special election.

## IV

The judgment of the Appellate Division is reversed. A special election is to be held in Chesilhurst for the offices of mayor and borough council as set forth herein. We defer the effective date of this opinion to July 31, 2000, to permit the scheduling of the special election in September 2000 pursuant to *N.J.S.A.* 40A:16–16.

*For reversal*—Chief Justice PORITZ and Justices O'HERN, STEIN, COLEMAN, LONG, VERNIERO and LaVECCHIA.

*Opposed*—None.