NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1205-20

IN THE MATTER OF THE
ELECTION FOR ATLANTIC
COUNTY FREEHOLDER
DISTRICT 3 2020 GENERAL
ELECTION, and ANDREW
PARKER.

_____

APPROVED FOR PUBLICATION

June 29, 2021

APPELLATE DIVISION

Submitted June 8, 2021 — Decided June 29, 2021

Before Judges Yannotti, Haas, and Mawla.

On appeal from the Superior Court of New Jersey,
Law Division, Atlantic County, Docket No. L-3929-
20.

Jardim, Meisner & Susser, PC, and Herman Law
Offices, LLC, attorneys for appellant Thelma
Witherspoon (Scott D. Salmon and Robert D. Herman,
on the briefs).

Law Offices of Madden & Madden, PA, attorneys for
respondent Office of the Atlantic County Clerk
(Patrick J. Madden, on the brief).

Gurbir S. Grewal, Attorney General, attorney for
amicus curiae Attorney General of New Jersey
(Melissa H. Raksa, Assistant Attorney General, of
counsel; Nicole E. Adams, Deputy Attorney General,
on the brief).

The opinion of the court was delivered by

MAWLA, J.A.D.

Appellant Dr. Thelma Witherspoon appeals from a Law Division order dated January 4, 2021, which revoked her certificate of election for County Commissioner[1] for the Third District in Atlantic County, declared a vacancy, and scheduled a special election for the position. We affirm.

This case arises from the November 3, 2020 election, in which Witherspoon and her opponent Andrew Parker[2] ran for the Atlantic County Commissioner, District Three position, which comprised portions of Egg Harbor Township and Hamilton Township. Witherspoon won, and Parker filed a contest, asking the court to invalidate the election because a number of voters received defective ballots that did not include the Third District Commissioner election.

Judge Joseph L. Marczyk tried the matter on facts set forth in a six-page stipulation filed by the parties whose relevant portions are as follows:

---

[1] The position of the Board of Chosen Freeholders has become the Board of County Commissioners and the position of "Freeholder" has been substituted by "County Commissioners." See L. 2020, c. 67 (eff. Jan. 1, 2021) (amending N.J.S.A. 1:1-2; N.J.S.A. 40:20-1).

[2] Parker did not participate in this appeal. In the trial court, the Attorney General appeared on behalf of the Board and the Superintendent of Elections to address the aspect of this case relating to the utilization of expert testimony. We granted his motion to appear as amicus curiae in this appeal.

7.   The Atlantic County Commissioner . . . , District Five, consists, in part, of Election Districts [One], [Two], [Three], [Five], [Six], and [Twelve] in Hamilton Township.

8.   The November 3, 2020 General Election was conducted pursuant to N.J.S.A. 19:63-31.

9.   The November 3, 2020 General Election was primarily a "Vote-by-Mail" election.

. . . .

13.   Pursuant to N.J.S.A. 19:63-7 and N.J.S.A. 19:63-9, vote-by-mail ballots for the November 3, 2020 General Election were designed, prepared, and printed on behalf of the Atlantic County Clerk.

14.   Pursuant to N.J.S.A. 19:63-7 and N.J.S.A. 19:63-9, vote-by-mail ballots for the November 3, 2020 General Election that were designed, prepared, and printed on behalf of the Atlantic County Clerk were to be sent to all active, qualified registered voters in Atlantic County.

. . . .

18.   Due to an error by the Office of the Atlantic County Clerk, 554 voters in Hamilton Township received incorrect vote-by-mail ballots for the November 3, 2020 General Election.

. . . .

21.   Of the 554 erroneous vote-by-mail ballots[,] . . . 219 were sent to voters in Hamilton Township, Election Districts [One], [Two], [Three], [Five], [Six], and [Twelve].

22. Of the 554 erroneous vote-by-mail ballots . . . 335 were sent to voters in Hamilton Township, Election Districts [Four], [Seven through Eleven], and [Thirteen].

23. The 219 erroneous ballots sent to Hamilton Township, Election District [One], [Two], [Three], [Five], [Six], and [Twelve] voters, contained the race for Atlantic County Commissioner . . . , District Three, a race in which the voters were not entitled to vote.

. . . .

24. The 335 erroneous ballots sent to Hamilton Township, Election District(s) [Four], [Seven through Eleven], and [Thirteen] voters, failed to contain the race for Atlantic County Commissioner . . . , District Three, a race in which the voters were entitled to vote.

. . . .

31. Of the 219 erroneous ballots sent to Hamilton Township, Election District [One], [Two], [Three], [Five], [Six], and [Twelve] voters, 161 erroneous ballots were returned.

32. Of the 335 erroneous ballots sent to Hamilton Township, Election District(s) [Four], [Seven through Eleven], and [Thirteen] voters, 237 erroneous ballots were returned.

33. Of the 554 erroneous vote-by-mail ballots . . . [fourteen] voters made application and received a "Corrected Ballot."

. . . .

37. In due course, the Atlantic County Board of Elections canvassed and counted the votes for the Atlantic County Commissioner . . . , District Three.

4

38.   The Atlantic County Board of Elections vote totals for Atlantic County Commissioner . . . , District Three, was:

. . . Witherspoon         15,034
. . . Parker              14,748

39.  . . . Witherspoon was certified as the winner of the race for Atlantic County Commissioner . . . , District Three.

40. . . . . Witherspoon's margin of victory over . . . Parker was 286 votes.

Witherspoon retained a political scientist, Tina M. Zappile, Ph.D., who prepared a report based on a statistical analysis and opined the erroneous ballots would not have changed the outcome of the election.   The Attorney General moved to bar Dr. Zappile's testimony and Parker joined in the motion.

The judge granted the motion and made the following oral findings:

> Here, [Witherspoon] is seeking to admit expert testimony regarding how rejected voters and illegal votes may have been cast.
>
> The [c]ourt rejects the argument that it is proper in New Jersey to offer expert testimony as to how disenfranchised voters would have voted had they been given or been provided with a proper ballot or how illegal voters may have voted in the context of an election challenge.
>
> There is no authority to allow such an expert in the context of this case.  Although there are situations when circumstantial evidence can be admitted to show how illegal votes were cast, if you look at [Nordstrom v. Lyon, 424 N.J. Super. 80 (App. Div. 2012)], there is

no controlling legal authority where it's been suggested that expert testimony of this kind would be permitted under the facts of this case.

More importantly, the apparent focus of [Witherspoon's] case in this matter is legal votes that were rejected. Our Supreme Court noted in [In re Petition of Gray-Sadler, 164 N.J. 486 (2000)], . . . courts cannot require candidates contesting the election to prove that the votes not cast due to irregularities such as defective ballots would have voted for the candidate challenging the election.

That is, the [c]ourt cannot speculate as to which candidate the disenfranchised voters may have cast their ballot. Rather, the petition need only show that enough qualified voters were denied the right to cast votes to affect the outcome of the election. . . .

. . . .

The . . . expert's opinions . . . are therefore not relevant in the [c]ourt's view even if the opinions are based on statistical analysis.

. . . .

. . . The citizen's constitutional right to vote for a candidate of his or her choice necessarily includes the corollary right to have that vote counted at full value without dilution or discount.

To preserve those rights, our state election laws are designed to deter fraud, safeguard the secrecy of the ballot[,] and prevent the disenfranchisement of qualified voters.

Again, as noted above, the voters cannot now cast a ballot. It would not be fair in the [c]ourt's view for an expert to be allowed to offer an opinion as to

how those disenfranchised voters would likely have voted.

After the expert was disqualified, the judge issued a written decision adjudicating the relief sought in Parker's petition. The judge outlined Parker's positions as follows:

> The primary argument advanced by [Parker] is that the Atlantic County Clerk erroneously provided ballots to 335 voters in the Third . . . District without a choice for the Third District [County Commissioner] race and therefore these voters were unable to vote for a candidate of their choice. Because of this error, [Parker] argues the court must invalidate the certificate of election because the number of disenfranchised voters exceeds the vote differences between the candidates. [Parker] relies on N.J.S.A. 19:29-l(e) which provides, in pertinent part, that a party to an election may contest the result of an election when "legal votes are rejected at the polls sufficient to change the results." [Parker] contends the 335 voters who received the wrong ballots had their legal votes rejected and were disenfranchised. [Parker] argues the right to vote freely for a candidate of one's choice is of the essence in a democratic society and other rights are illusory if the right to vote is undermined. N.J. Democratic Party, Inc. v. Samson, 175 N.J. 178 (2002).

> [Parker] relies on Application of Moffat, 142 N.J. Super. 217, 224 [(App. Div. 1976)], certif. denied, 65 N.J. 577 (1974)[,] for the proposition that when legal votes have been rejected, the contestant does not have the burden of showing specifically for whom the votes were cast. Rather, the contestant's burden would be met by a demonstration that had the votes been cast for him, the result would have been different. Petitioner argues that if the results of the

election stand, all of the voters in the Third . . . District would be disenfranchised in one way or another. Plaintiff notes the 335 qualified voters, who received ballots without a choice for the Third [District County Commissioner] race, were all disenfranchised whether they voted or not because all of the voters never had a chance to vote for a candidate of their choice.[3]

The judge summarized Witherspoon's arguments as follows:

[Witherspoon] contends that not all irregularities, tragic as they may be, require a judicial response and that there is a tremendous burden and cost on the voters, candidates[,] and taxpayers to hold a new election.

[Witherspoon] contends that comparing ballots affected by the issues in this case to the margin of victory is a flawed methodology. [Witherspoon] contends there is no evidence to suggest that the qualified voters who should have been sent a ballot that contained the race, and did not vote, would have voted if sent the correct ballot and that these voters should not get a "second bite at the apple." In addition, [Witherspoon] argues that voters were "explicitly given the option to cure the ballot deficiencies by voting provisionally on Election Day."

With respect to the legal votes that were arguably rejected, [Witherspoon] contends that the court should not use the 335 figure for the number of

---

[3] Parker also raised arguments pursuant to N.J.S.A. 19:29-1(a), challenging the result of the election based on the "malconduct" of the County Clerk and asserted the court should invalidate the election result pursuant to N.J.S.A. 19:29-1(e), based on illegal votes cast by those not domiciled in the Third District. The judge addressed and rejected those arguments, and they are not part of this appeal.

votes rejected. Rather, the court should look to the number of those 335 who actually voted. Witherspoon indicates that 244 (not 248 as indicated by Parker) were returned of which [seven] were duplicates leaving 237 remaining ballots. [Witherspoon] further notes that [twenty-three] of these voters did ultimately vote provisionally bringing the number down to 214. At the hearing, [Witherspoon] indicated that [seven] corrected ballots were obtained by the voters in this group of 335 qualified voters. That is a stipulated fact. Witherspoon further argued that [twenty-three] voters voted via a corrected provisional ballot. This . . . figure (of voters who voted by provisional ballot) is not stipulated by the parties, but is addressed below. [Witherspoon] submits that the court should not consider votes of those who did not vote at all because these were not legal votes that were rejected.[4]

The judge rejected Witherspoon's argument that N.J.S.A. 19:63-26 superseded N.J.S.A. 19:29-1. Citing In re Livingston, 83 N.J. Super. 98, 107 (App. Div. 1964), in which we interpreted the predecessor statute to N.J.S.A. 19:63-26, the judge noted we held that our election laws should not be construed so as to deprive voters of their franchise. The judge noted the issues raised in this case were not "mere technicalit[ies]" but fundamental errors that

---

[4] The judge also noted Witherspoon asserted the following arguments with respect to the illegal votes: (1) Parker had not met his burden of proof to vacate those votes by showing for whom the illegal votes were cast; and (2) Witherspoon should not "suffer when she complied with the rules of the election contest . . . and the election was impacted by the Clerk's actions and not anything that [Witherspoon] did . . . ." As we noted in footnote three, these arguments are not part of this appeal.

may have altered the outcome of the election because voters were denied the right to vote.

Turning to N.J.S.A. 19:29-1(e) and Parker's argument asserting the legal votes rejected warranted a new election, the judge pointed out our Supreme Court in Gray-Sadler "defined the term ['rejected'] 'to include any situation in which qualified voters are denied access to the polls.'" Furthermore, the judge stated:

> [T]he Court further indicated that voters need not be physically barred from voting to have their votes rejected, but may instead show that, through no fault of their own, they were prohibited from voting for a specific candidate by some irregularity in the voting procedures. [Gray-Sadler, 164 N.J. at 475 (citing In re Moffat, 142 N.J. Super. at 223).] The essential question is whether voters were denied the opportunity to vote for a candidate of their choice. Ibid.

The judge concluded N.J.S.A. 19:63-26 and N.J.S.A. 19:29-1 should be read in pari materia and harmonized rather than viewed as inapposite. He concluded "the [335] voters who were sent a defective ballot that did not include the Third District [County Commissioner] election, through no fault of their own, were rendered incapable of voting for the candidate of their choice" and "are properly characterized as 'rejected legal votes.'" The judge reduced this figure to 328 to account for the seven voters who received corrected ballots.

The judge found Parker met his burden to set aside the election because "there were sufficient legal votes rejected to change the results pursuant to N.J.S.A. 19:29-1(e) as [Witherspoon's] margin of victory was 286 votes." The judge stayed the order pending appeal.

Witherspoon raises the following arguments on appeal:

> POINT ONE
>
> THE TRIAL COURT ERRED IN FINDING, PURSUANT TO N.J.S.A. 19:29-1(e), THAT RESPONDENT PARKER MET THE BURDEN TO VACATE THE RESULTS OF THE NOVEMBER 3, 2020 GENERAL ELECTION.
>
> > A. The Trial Court Erred in Considering Votes That Were Never Cast as "Legal Votes Rejected".
>
> POINT TWO
>
> THE TRIAL COURT ERRED IN BARRING THE TESTIMONY OF APPELLANT'S EXPERT WITNESS.
>
> POINT THREE
>
> THE TRIAL COURT ERRED IN FAILING TO APPLY N.J.S.A. 19:63-26, WHICH PROHIBITS OVERTURNING ELECTIONS DUE TO IRREGULARITIES OR FAILURES IN THE PREPARATION/FORWARDING OF MAIL-IN BALLOTS.

11

## I.

In Points I and III, Witherspoon argues the judge erred when he concluded Parker met the burden of proof to vacate the election result. She challenges the judge's finding that the votes not cast were "legal votes rejected" under N.J.S.A. 19:29-1(e) because the ballots of voters who voted on defective ballots were accepted and canvassed. She asserts the actual legal votes rejected were 230, which is less than her 286-vote margin of victory. She also asserts twenty-four voters out of the 328 who received defective ballots came to the polls, and requested and submitted provisional ballots thereby curing the ballot deficiency, and thus were not denied access to the polls. She repeats the claim that N.J.S.A. 19:63-26 barred Parker's challenge because the statute limits the court's ability to overturn an election due to irregularities and supersedes N.J.S.A. 19:29-1.

The Attorney General urges us to affirm and argues N.J.S.A. 19:63-26 does not supersede 19:29-1. He argues N.J.S.A. 19:63-26 is a rebuttable presumption against overturning an election unless there are grounds to do so under N.J.S.A. 19:29-1.

The parties' arguments concern statutory interpretation. Therefore, our review is de novo. Murray v. Plainfield Rescue Squad, 210 N.J. 581, 584 (2012).

12

As a general proposition, "election laws are to be liberally construed to the end that voters are permitted to exercise the franchise and that the will of the people as expressed through an election is heard." In re Contest of Nov. 8, 2005 Gen. Election for Off. of Mayor of Twp. of Parsippany-Troy Hills, 192 N.J. 546, 559 (2007) (Parsippany II). "A citizen's constitutional right to vote for the candidate of his or her choice necessarily includes the corollary right to have that vote counted 'at full value without dilution or discount.'" Gray-Sadler, 164 N.J. at 474 (quoting Reynolds v. Sims, 377 U.S. 533, 555 n.29 (1964)). "The fundamental purpose of an election contest is 'to ascertain the true will of the electorate.'" Nordstrom, 424 N.J. Super. at 103 (quoting Kirk v. French, 324 N.J. Super. 548, 552 (Law Div.1998)).

"Our election laws provide . . . the framework within which our Legislature has directed an election contest must proceed," including "both the grounds on which an election may be contested, and the manner in which the contest may be brought and decided." Parsippany II, 192 N.J. at 559. A judge hearing a contest petition, following a trial "similar to those in a civil action so far as practicable . . . under the control and direction of the court," must "pronounce judgment whether the incumbent or any contestant was duly elected." N.J.S.A. 19:29-5; N.J.S.A. 19:29-8. "If the judge finds that no person was duly elected, the judgment shall be that the election be set aside."

13

N.J.S.A. 19:29-9. "A judge may not speculate as to the voter's intent in order to validate a ballot . . . ." In re Mallon, 232 N.J. Super. 249, 262 (App. Div. 1989).

N.J.S.A. 19:29-1 sets forth nine grounds on which to challenge an election. In relevant part, it states:

> The . . . election of any person to any public office . . . may be contested by the voters of this State or of any of its political subdivisions affected thereby upon [one] or more of the following grounds:
>
> . . . .
>
> e. When illegal votes have been received, or legal votes rejected at the polls sufficient to change the result . . . .
>
> [N.J.S.A. 19:29-1(e).]

"The origins of this provision are quite ancient, and it has been included as a ground to challenge a municipal election since 1876." Parsippany II, 192 N.J. at 561.

The Supreme Court has stated: "Simple deviance from statutory election procedures, absent fraud or malconduct, will not vitiate an election unless those contesting it can show that as a result of irregularities 'the free expression of the popular will in all human likelihood has been thwarted.'" Gray-Sadler, 164 N.J. at 482 (quoting Wene v. Meyner, 13 N.J. 185, 196 (1953)). "In determining whether certain irregularities rise to a level which

requires nullifying an election . . . [i]t is only where the irregularities at an election are such that the court cannot with reasonable certainty determine who received the majority of the legal vote, that an election will be set aside." Mallon, 232 N.J. Super. 270.

A petitioner contesting the outcome of an election based on the rejection of legal votes "need not identify for whom the rejected voter voted or would have voted, only that the rejected votes were sufficient in number that, if all were credited to him, the results of the election would change." In re Contest of Nov. 8, 2005 Gen. Election for Off. of Mayor for Twp. Parsippany-Troy Hills, 388 N.J. Super. 663, 677 (App. Div. 2006) (Parsippany I), aff'd as modified on other grounds by Parsippany II, 192 N.J. at 572. We explained the rationale is that even "[w]hen the wrongfully disenfranchised voter is able to be identified, he cannot be compelled to disclose for whom he did or would have voted." Ibid.

A vote has been "rejected" under N.J.S.A. 19:29-1(e), in "any situation in which qualified voters are denied access to the polls," Gray-Sadler, 164 N.J. at 475 (quoting In re 1984 Maple Shade Gen. Election, 203 N.J. Super. 563, 590 (Law Div. 1985)), or who, "through no fault of their own," have been "prohibited from voting for a specific candidate by some irregularity in the voting procedures." Gray-Sadler, 164 N.J. at 476. "The essential question is

whether voters were denied the opportunity to vote for a candidate of their choice." Ibid. A successful election contester "must prove by a preponderance of the evidence that illegal votes were received or legal votes were rejected . . . ." In re Nov. 2, 2010 Gen. Election for Off. of Mayor in Borough of S. Amboy, 423 N.J. Super. 190, 200 (App. Div. 2011).

In Gray-Sadler, the Supreme Court nullified election results where write-in candidates for mayor and borough council proved that confusing instructions for submission of a write-in vote resulted in several voters who submitted write-in votes that the Board of Elections rejected and others not casting votes at all. 164 N.J. at 484. The Court noted because the votes for the mayoral write-in-candidate that were rejected when added to the counted votes exceeded that of the prevailing candidate, the irregularities were "so serious as to prejudice the election result." Id. at 482. Regarding the borough council candidates, the Court concluded even though they still trailed by ten votes after adding the rejected write-in votes, many of the voters who did not vote for council at all may have been deterred by the confusing instructions. Id. at 482-83. The Court concluded it was impossible to "determine with reasonable certainty those candidates who received a majority of the votes . . . ." Id. at 484.

16

Similarly, here, Parker met the burden of proof under N.J.S.A. 19:29-1(e) because the ballots sent to numerous voters in the Third District were defective, rendering voters incapable of voting for County Commissioner. Because 328 voters were prevented from voting and the number exceeded Witherspoon's 286-vote margin of victory, Parker proved the missing votes were sufficient to change the result.

We reject Witherspoon's argument the voters who submitted defective ballots that were missing the Third District race were not rejected legal votes as defined by N.J.S.A. 19:29-1(e). As in Gray-Sadler, the defective ballots issued by the Atlantic County Clerk here prevented voters from voting "through no fault of their own" and "prohibited [them] from voting for a specific candidate by some irregularity in the voting procedures." 164 N.J. at 476.

We also reject Witherspoon's argument that the sum of rejected votes calculated by Judge Marczyk was incorrect. As we noted, the issue here is "whether voters were denied the opportunity to vote for a candidate of their choice," ibid., not as Witherspoon asserts, whether these voters would have voted had they not been deprived of the opportunity to do so. The defective ballots sent to 335 voters provided them no opportunity to vote for any

candidate in the Third District County Commissioner race. Regardless of their intent, these voters were disenfranchised.

Moreover, the fact seven voters sought out and submitted cured ballots does not persuade us there was reversible error here. In Gray-Sadler, 154 voters were able to submit a write-in vote despite the confusing instructions, yet the Court did not infer from this that the sixty-four voters who did not adhere to the procedures and submitted defective write-in votes had forfeited their opportunity to vote in the election. Id. at 473. Therefore, because seven voters submitted cured ballots here does not persuade us the 328 voters who did not had forfeited their right to vote.

We are likewise unconvinced by Witherspoon's argument the twenty-four voters who received defective ballots and then came to the polls and requested and submitted provisional ballots is grounds for reversal. This group would only reduce the number of rejected votes to 304, which still exceeded the 286-vote margin of victory, and Parker still established "the rejected votes were sufficient in number that, if all were credited to him, the results of the election would change." Parsippany I, 388 N.J. Super. at 677.

Witherspoon's assertion N.J.S.A. 19:29-1 does not apply to an election pursuant to the Vote By Mail Law, N.J.S.A. 19:63-1 to -28, which the Legislature enacted in 2009, is an issue of first impression. She asserts that,

by omitting "mail-in ballot deficiencies" from the list of enumerated grounds for voiding an election under N.J.S.A. 19:29-1, the Legislature intended to "exclud[e]" such deficiencies as potential grounds for invalidating an election, and then "clarifie[d]" that exclusion by enacting N.J.S.A. 19:63-26. She argues "mail-in ballots are simply different than regular in-person ballots" because, unlike in-person voting, mail-in voting allows the voter the recourse of filling out a provisional ballot on election day. We disagree.

> Our paramount goal in interpreting a statute is to give effect to the Legislature's intent. When that intent is revealed by a statute's plain language — ascribing to the words used "their ordinary meaning and significance" — we need look no further. However, not every statute is a model of clarity. . . . An enactment that is part of a larger statutory framework should not be read in isolation, but in relation to other constituent parts so that a sensible meaning may be given to the whole of the legislative scheme. We also must be guided by the legislative objectives sought to be achieved by enacting the statute.
>
> [Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 572 (2012) (emphasis added) (citations omitted).]

The Supreme Court has stated:

> [L]egislative intent controls because "statutes are to be read sensibly rather than literally and the controlling legislative intent is to be presumed as consonant to reason and good discretion." When "discerning that [legislative] intent we consider not only the particular

19

statute in question, but also the entire legislative scheme of which it is a part."

[Haines v. Taft, 237 N.J. 271, 283 (2019) (second alteration in original) (citations omitted) (superseded by statute for different reasons).]

Similarly, in the context of election law, we have observed:

Even an election statute that is facially "straightforward" must be construed "in a common-sense way that accords with the legislative purpose" of the election laws to avoid disenfranchising qualified voters. . . .

"Where there are two contradictory provisions in a statute, the primary object is to ascertain the legislative design with reasonable certainty[.]" . . . The Legislature is presumed to be familiar with its existing enactments and is presumed to intend that its newer enactments be harmonized with the existing ones, in light of the Legislature's purpose.

When attempting "to discover the legislative intent, the statute must be read in light of the old law, the mischief sought to be eliminated and the proposed remedy." Also, "[a]cts in pari materia as well as related acts not strictly in pari materia, should be examined." . . .

In construing election laws, we bear in mind their fundamental purpose. "Because the right to vote is the bedrock upon which the entire structure of our system of government rests, our jurisprudence is steadfastly committed to the principle that election laws must be liberally construed to effectuate the overriding public policy in favor of the enfranchisement of voters." Afran v. Cty. of Somerset, 244 N.J. Super. 229, 232 (App. Div. 1990).

20

> "[O]ur state election laws are designed to deter fraud, safeguard the secrecy of the ballot, and prevent disenfranchisement of qualified voters. In furtherance of those goals, we have held that it is our duty to construe elections laws liberally." [Gray-Sadler, 164 N.J. at 474-75] (citations omitted).
>
> [Correa v. Grossi, 458 N.J. Super. 571, 579-81 (App. Div. 2019) (second, fourth, and sixth alterations in original) (citations omitted).]

By way of background, Governor Murphy issued an executive order, titled "An Order to Protect Public Health By Mailing Every Active Registered Voter a VBM [Vote-By-Mail] Ballot Ahead of the General Election." Exec. Order. No. 177 (Aug. 14, 2020), 52 N.J.R. 1701(b), which required "[t]he November General Election shall be conducted primarily via vote-by-mail ballots[.]" On August 28, 2020, the Legislature enacted three separate election-related laws, namely: a law designed to "modify and establish various voting procedures," for the 2020 election and beyond, including provisions relating to the "curing" of mail-in ballots (The Ballot Cure Act), L. 2020, c. 70; and two laws that codified several of the vote-by-mail procedures for the 2020 election directed by Executive Order Number 177, and amended various other statutory provisions, L. 2020, c. 71; L. 2020, c. 72 (collectively, the 2020 election statutes).

Notably, the 2020 election statutes declared the Legislature's intent not to disturb the existing scheme for election laws by stating: "The November

2020 General Election shall be conducted in accordance with Title 19 except as set forth below." N.J.S.A. 19:63-31(a). Among the new election procedures implemented were a codification of the directive in Executive Order 177 that the election would be "conducted primarily via vote-by-mail ballots," N.J.S.A. 19:63-31(a).

The Vote By Mail Law grants all qualified voters the right to vote using a mail-in-ballot "in all future elections, including general elections, held in this State, in which the voter is eligible to vote." N.J.S.A. 19:63-3(a)(1). The statute requires "[e]ach county clerk" to "print[] sufficient mail-in ballots . . . for the general election," N.J.S.A. 19:63-7(a), and directs that "[w]hen mail-in ballots are prepared, the name of any candidate who has been nominated for any office shall be placed on the ballot to be used in the general election to be held in the year in each election district in which he is a candidate." N.J.S.A. 19:63-11(b). The law also states: "No election shall be held to be invalid due to any irregularity or failure in the preparation or forwarding of any mail-in ballots prepared or forwarded pursuant to the provisions of [the Vote By Mail Law]." N.J.S.A. 19:63-26 (emphasis added).

"In analyzing legislation, 'the words "must" and "shall" are generally mandatory.'" State v. Sorensen, 439 N.J. Super. 471, 488 n.6 (App. Div. 2015) (quoting Harvey v. Bd. of Chosen Freeholders, 30 N.J. 381, 391 (1959)).

"[T]he word 'any' clearly is synonymous with the word 'all.'" In re Ordinance 04-75, 192 N.J. 446, 461 (2007).

Here, the parties stipulated the ballot defect was "an error by the Office of the Atlantic County Clerk," not the voters. They further stipulated the error resulted in "554 voters in Hamilton Township receiv[ing] incorrect vote-by-mail ballots for the November 3, 2020 General Election," including "335 erroneous ballots sent to Hamilton Township, Election District(s) [Four], [Seven through Eleven], and [Thirteen] voters," which "failed to contain the race for Atlantic County Commissioner . . . District Three, a race in which the voters were entitled to vote." Therefore, the defect here was in "mailing" or "preparation" of the ballots, and implicated N.J.S.A. 19:63-26.

However, we reject Witherspoon's interpretation of the statute because it requires us to read N.J.S.A. 19:63-26 in a manner that is inconsistent with the other provisions of Title 19 and the Legislature's intent to ensure voter franchise. We are not convinced the Legislature intended to eliminate the ability to contest an election pursuant to N.J.S.A. 19:29-1 merely because the vote occurred by mail. Moreover, N.J.S.A. 19:63-26 references "any irregularity or failure in the preparation or forwarding of any mail-in ballots," it does not specifically mention votes rejected due to an irregularity of the voting procedures through no fault of the voters, as happened here.

23

Witherspoon's interpretation of N.J.S.A. 19:63-26 would lead to an absurd result, construe our election laws in a way to deprive voters of the franchise, and devitalize N.J.S.A. 19:29-1.

The better interpretation of the law is the one suggested by the Attorney General. Harmonizing N.J.S.A. 19:63-26 and N.J.S.A. 19:29-1 and reading the statutes in pari materia with the overall scheme of our election, as we must, we hold N.J.S.A. 19:63-26 operates as a rebuttable presumption. In other words, N.J.S.A. 19:63-26 establishes a presumption that an irregularity or failure in the preparation of forwarding of any mail-in ballot will not invalidate an election. However, a contestant may rebut the presumption by asserting one or more of the grounds under N.J.S.A. 19:29-1 as a basis to invalidate the election. An election shall be set aside if the trial judge concludes the contestant has proved a basis to do so under N.J.S.A. 19:29-1 by a preponderance of the evidence and the judge finds that no person was duly elected, as per N.J.S.A. 19:29-9. For these reasons, Judge Marczyk did not err.

II.

Point II of Witherspoon's brief challenges the exclusion of Dr. Zappile's testimony and asserts the expert would have established there were insufficient votes to overcome the margin of victory. The Atlantic County Clerk argues expert testimony should be permitted in election contest cases and urges us not

24

to adopt a bright line rule to the contrary, but takes no position whether Dr. Zappile's testimony was appropriate in this case. The Attorney General urges us to affirm the decision to bar the expert because the testimony would have been speculative.

Expert testimony is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." N.J.R.E. 702. Because "[t]he admission or exclusion of expert testimony is committed to the sound discretion of the trial court[,] . . . a trial court's grant or denial of a motion to strike expert testimony is entitled to deference on appellate review." Townsend v. Pierre, 221 N.J. 36, 52 (2015).

Dr. Zappile's testimony was properly barred because it would not have assisted the judge in deciding the dispute. As Judge Marczyk found, pursuant to Gray-Sadler, 168 N.J. at 482, the issue in this case was whether the number of legal votes rejected was enough to change the result of the election. The Gray-Sadler Court held, because election contestants could not "prove that votes not cast . . . would have been cast for them," the Court could not "require them to prove to a certainty how the rejected voters would have voted . . . ." Id. at 482-83. Six years after Gray-Sadler, we held that a party contesting an election based on the number of rejected votes need only show "the rejected

votes were sufficient in number that, if all were credited to him [or her], the results of the election would change." Parsippany I, 388 N.J. Super. at 677.

Witherspoon cites Mallon, and asserts we held that in deciding whether election irregularities warrant nullification of an election the court should consider "the significance of its influence and consequential derivations in order to determine whether the digression or deviation . . . had in reasonable probability so imposing and so vital an influence on the election proceedings as to have repressed or contravened a full and free expression of the popular will." 232 N.J. Super. at 270. However, Witherspoon has taken our holding out of context.

The quote emanates from Sharrock v. Borough of Keansburg, 15 N.J. Super. 11, 17 (App. Div. 1951), and reads as follows:

> The processes of public elections in this country are not of common law origin. Except for the express requirements of the constitutional security they are the creatures of statutory law. Therefore the courts refrain from an indulgence in any judicial action that refashions legislation regulating and facilitating the conduct of elections and which is calculated to secure the right of suffrage and the free expression of the choice of the voter.
>
> And so, where the statute expressly declares that a specified irregularity shall nullify an election, the courts, irrespective of their views of the wisdom or serviceability of the requirement, uniformly respect the legislative declaration.

> But where, as here, there is no such legislative declaration, the courts consider the nature of the irregularity, its materiality, the significance of its influence and consequential derivations in order to determine whether the digression or deviation from the prescribed statutory requisitions had in reasonable probability so imposing and so vital an influence on the election proceedings as to have repressed or contravened a full and free expression of the popular will . . . .
>
> [Ibid. (emphasis added).]

The election irregularity at issue here—rejected votes—is one which the Legislature, in N.J.S.A. 19:29-1(e), expressly declared would constitute grounds to contest an election, and which our case law has uniformly interpreted to constitute grounds for nullifying an election. Gray-Sadler, 164 N.J. at 482-83; Parsippany I, 388 N.J. Super. at 677; Mallon, 232 N.J. Super. at 270. For these reasons, expert testimony was unnecessary in this case and Judge Marczyk did not abuse his discretion in barring Dr. Zappile's testimony. Finally, we decline to adopt a bright line rule regarding the admissibility of expert testimony in this case type because Sharrock provides the proper framework for the consideration of such evidence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION