NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2536-24

MICHAEL HOPSON,

       Plaintiff-Appellant/
       Cross-Respondent,

v.

ANTHONY CIRZ,

       Defendant-Respondent/
       Cross-Appellant,

and

FIRE DISTRICT NO. 1 OF
TOMS RIVER TOWNSHIP,
DANIEL ROMAN, in his
individual and official
capacity, ROBERT KROHN,
in his individual and official
capacity, MONICA BISCEGLIE,
in her individual and official
capacity, DAWN HALLIWELL,
in her individual and official
capacity, OCEAN COUNTY
BOARD OF ELECTIONS,
OCEAN COUNTY CLERK,
JAMES GOLDEN, as an
interested party, and RICHARD
TUTELA, as an interested party,

       Defendants-Respondents.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **July 1, 2025** |
| **APPELLATE DIVISION** |

Argued June 3, 2025 – Decided July 1, 2025

Before Judges Gilson, Firko, and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-0679-25.

Matthew C. Moench argued the cause for appellant/cross-respondent (King, Moench & Collins, LLP, attorneys; Matthew C. Moench, of counsel and on the briefs; Alyssa D. Zara, on the briefs).

Scott D. Salmon argued the cause for respondent/cross-appellant (Jardim Meisner Salmon Sprague & Susser, PC, attorneys; Scott D. Salmon, of counsel and on the brief; Julia Burzynski, on the brief).

Mark A. Gulbranson, Jr. argued the cause for respondent Ocean County Board of Elections (Matthew J. Platkin, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Mark A. Gulbranson, Jr., Deputy Attorney General, on the brief).

The opinion of the court was delivered by

FIRKO, J.A.D.

Petitioner Michael Hopson was an unsuccessful candidate in the February 15, 2025 election for a position as Commissioner of Toms River Fire District No. 1 (Fire District). Hopson filed a petition challenging the amendment of the election certification by defendant Fire District Clerk Robert Krohn to count a write-in vote for defendant candidates Anthony Cirz and

James Golden, which changed the election results from a tie between Cirz and Hopson to Cirz winning by one vote.

Cirz cross-appeals from the dismissal of his cross-petition rejecting the mail-in ballot of V.G.,[1] because she submitted a deficient ballot. Cirz also cross-appeals from the order rejecting the mail-in ballots of M.B., P.B., and J.D., and denying his motion for leave to file an amended cross-petition challenging the rejection of an additional mail-in ballot from an unidentified voter.

Following a two-day bench trial on April 14 and 15, 2025, the trial court determined that the write-in votes for Cirz and Golden cast on the voting machine were to be counted in their favor. The trial court ruled the mail-in ballots submitted by V.G., M.B., P.B., M.D., J.D., J.R., P.Ba., and S.B. were not to be counted. The trial court also ruled the mail-in ballot submitted by Z.G. would remain counted. The trial court then declared Cirz the winner of the election, and dismissed Hopson's petition challenging the election results. Hopson now appeals from that dismissal.

We affirm the trial court's decision not to count the mail-in ballot submitted by V.G. However, we reverse the trial court's decision permitting the write-in votes to be counted because the candidates were listed on the

---

[1] We use initials to protect the confidentiality of the voters.

A-2536-24

ballot. We remand the matter for entry of an order for a run-off election between Hopson and Cirz for the one open seat. We affirm the trial court's decision barring Cirz from filing a belated third amended answer and cross-petition.

I.

These are the relevant facts apparent from the record. Four candidates for the two open seats on the Board of Fire Commissioners were listed on the ballot: Hopson, Cirz, Golden, and defendant Richard Tutela. Voters were instructed to "Vote for TWO" of the candidates.

Defendant Dawn Halliwell, the Fire District Financial Clerk, testified that she was responsible for the "operations" at the close of the election, receiving the totals from each polling place, and creating an Excel spreadsheet of the results. The spreadsheet was entitled, "RESULTS OF ANNUAL ELECTION OF FIRE COMMISSIONER CANDIDATES AND APPROPRIATIONS FOR FIRE DISTRICT NO. 1 OF TOMS RIVER TOWNSHIP, OCEAN COUNTY, NEW JERSEY HELD ON FEBRUARY 15, 2025."

Halliwell maintained the spreadsheet on her computer until Monday, February 24, 2025, when she received from defendant Board of Elections (the Board) the "certified absentee ballot results" from all of the mail-in votes that

the Board had processed. After updating the spreadsheet, on February 25, 2025, at 10:36 a.m., Halliwell emailed defendant Monica Bisceglie, the Fire District's Human Resources Coordinator, stating that Halliwell had left "two copies of election results on [her] chair to [be] signed by the [C]lerk tomorrow night then post on our website and put in [the] minute book." Bisceglie replied to Halliwell by email on February 26, 2025, at 7:40 a.m., that she noticed the spreadsheet did not list any write-in votes.

Bisceglie updated the spreadsheet to reflect that there were five write-in votes, resulting in the following vote totals listed on the spreadsheet:

| | |
|---|---|
| Cirz | 615 |
| Golden | 614 |
| Hopson | 615 |
| Tutela | 690 |
| Write-Ins | 5 |

Krohn, as Fire District Clerk, signed the spreadsheet certifying the election results. Krohn testified that he accepted Halliwell's numbers without doing any of his own review because Halliwell "worked there longer than I've been alive and has no reason to lie to me." The certified spreadsheet reflecting a tie between Cirz and Hopson for one of the two open commissioner seats was uploaded to the Fire District's website.

A-2536-24

After Krohn certified the election results, Halliwell reviewed the "tapes" from each voting machine and discovered the "third printout . . . where the write-ins are." Halliwell then noticed that one of the five write-in votes was for "Cirz" and one was for "Golden." Both of those write-in votes had been made by a single voter who voted by machine, typing in the names. As the parties stipulated, "Cirz" was typed next to candidate Cirz's name and "Golden" was typed next to candidate Golden's name.

On March 3, 2025, at 2:15 p.m., Bisceglie emailed Jason Varano from the Board posing questions regarding the consequences of a tie in the election. Halliwell separately called the Board and asked if a voter could vote for named candidates and also submit write-in votes for the same candidates. According to her testimony, Halliwell was told "once they write[-in] the two write-ins, they're locked out from picking a candidate. So they couldn't write[-]in the two names and then also vote for the two names."

Halliwell inquired about the Board's policy and was told the Board "would not count" the write-in votes for the named candidates. Halliwell testified she then made the "unilateral decision on [her] own without talking to anybody else that these ballots should be counted." Halliwell explained that, notwithstanding the Board's policy, the Fire District "d[id]n't have a policy and it's our election."

6

On Tuesday, March 4, 2025, Halliwell and Bisceglie conferred and reviewed reorganization materials for the upcoming Fire District meeting. Halliwell testified that she then realized the spreadsheet certifying the election results was wrong because it did not include one of the write-in votes in Cirz's vote tally and one in Golden's vote tally. Halliwell updated the spreadsheet to show the following vote totals:

| | |
|---|---|
| Cirz | 616 |
| Golden | 615 |
| Hopson | 615 |
| Tutela | 690 |
| Write-Ins | 5 |

Halliwell explained she left the number of write-in votes on the spreadsheet as five "[b]ecause there's still five write-ins" although she acknowledged there were only three write-in votes that were not included in the tally for the named candidates.

Also on March 4, 2025, Bisceglie emailed the Board to "disregard" her March 3, 2025 email as "[w]e were informed it is out of the . . . [B]oard[']s hands." Bisceglie testified that she sent this email based on the information Halliwell had received when she called the Board.

That same day, Halliwell notified Krohn and Brian Kubiel, the Fire

A-2536-24

District administrator, by email of the presumed error in the first certification spreadsheet. Defendant Daniel Roman, the Fire District treasurer, was also notified of the issue by email. Roman went to the Fire District's office and reviewed the voting machine tapes himself. Roman consulted with an attorney friend, who was not the Fire District's attorney, and told Bisceglie to post the revised votes tally.

Krohn testified that he received an email about the "discrepancy in the results" and was asked if he would sign the revised spreadsheet. Krohn authorized his electronic signature being affixed to the revised spreadsheet certifying the election results the day before the reorganization meeting. Krohn explained that he revised the spreadsheet based solely on Halliwell's representation, and he did not consult with an attorney, the Fire District administrator, or the other Fire District commissioners. The revised certified spreadsheet was thereafter posted on the Fire District's website. Roman swore in Cirz as a Fire District commissioner. Tutela, whose election was never in question, was also sworn in.

The next Fire District meeting was held on March 5, 2025. The meeting was not recorded because Bisceglie, whose job it was to record the meetings, was suspended. During the meeting, the Fire District's attorney made a statement regarding the updated election results, and Cirz took his seat on the

8

dais.

On March 7, 2025, Hopson filed his verified petition and complaint in the Law Division against defendants seeking a declaratory judgment that Cirz was not the winner of the election (count one); contesting the election results under N.J.S.A. 19:29-1 due to malconduct, fraud, and corruption (count two); contesting illegal votes received (count three); alleging error by the Board (count four); and asserting he was deprived of his rights under the New Jersey Civil Rights Act (NJCRA), N.J.S.A. 10:6-1 to -2 (count five). Hopson sought to either be declared the lawful winner of one of the two commissioner seats in the Fire District election, or alternatively, sought a declaratory judgment that the election for one of the seats had resulted in a tie, thereby requiring a special election.

The trial court issued an order to show cause directing the parties to respond to Hopson's verified petition and complaint. Cirz filed an answer and cross-petition seeking to have the mail-in ballots of V.G., M.B., P.B., and J.D.—as well as others—counted. Thereafter, Cirz filed a first and second amended answer and cross-petition alleging additional ballot challenges.

Three days before the trial commenced, Cirz moved for leave to file a third amended answer and cross-petition challenging the rejection of an additional mail-in ballot from an unidentified voter as an overvote. At the end

of the first day of testimony, the trial court denied Cirz's motion for leave to file a third amended answer and cross-petition.

V.G. testified that she was registered to vote in Toms River and she attempted to vote in the February 15, 2025 Fire District election by mail-in ballot, but her vote was not counted. V.G. explained she mailed her ballot on February 10, 2025, but had filled out the ballot incorrectly. V.G. wrote her name and address on the outer envelope of the mail-in ballot. However, on the inner envelope, V.G. left the "Certificate of Mail-In Voter," which asked for the voter's name, address, and signature attestation, blank. As V.G. testified, "[t]here was a part [she] was supposed to sign but [she] didn't see it." She was supposed to "sign[] the bottom portion," which states, "Certificate of Mail-In Voter," but did not.

At some point during the week after the election, V.G. went to the Board to try to cure the defect but was told "there was nothing else that could be done." She never received a letter offering the opportunity to cure her ballot.

M.B. testified that she attempted to vote in the February 15, 2025, Fire District election by mail-in ballot but her vote was not counted. She mailed her ballot on Saturday, February 15, 2025, by placing it into her personal mailbox at the street end of her driveway between 8:20 a.m. and 8:30 a.m. M.B.'s ballot was thereafter postmarked February 18, 2025.

P.B. attempted to testify at trial, but there were technical difficulties with the Zoom connection. The parties stipulated he filled out his mail-in ballot for the February 15, 2025 Fire District election and that it was placed in his home mailbox on the morning of February 15, 2025. P.B.'s mail-in ballot was postmarked February 18, 2025.

J.D. testified that he is fully disabled and votes by mail-in ballot. He filled out his ballot for the February 15, 2025 Fire District election on February 7 or 8, 2025, and put the ballot in his personal mailbox by his curb. J.D.'s ballot was thereafter postmarked February 18, 2025.

The trial court found all of the witnesses "credible." The trial court determined the two write-in votes for Cirz and Golden should be counted and dismissed counts one through four of Hopson's verified petition and complaint with prejudice and count five under the NJCRA without prejudice. The trial court acknowledged N.J.S.A. 19:49-5, which provides that "[n]o irregular ballot shall be voted for any person for any office whose name appears on the machine as a nominated candidate for that office . . . ; any irregular ballot so voted shall not be counted." However, the trial court determined that the "intent of [the] statute is to prevent a voter from casting two votes for the same candidate." The trial court noted voters have the right to have their votes "counted at full value without dissolution or discount."

11

The trial court noted that the two certifications issued by the Fire District and the changes to "the tallies . . . without the write-in votes changing" were "questionable" and caused "consternation among the voters of Toms River." However, the trial court determined that the process was "faithful" and "abided by certain [principles] of law."

The trial court found that the voter who wrote in "Cirz" intended to vote for candidate Cirz. The trial court noted that "nothing" in the ballot instructions "indicates that if a person's name is printed you cannot write it in." The trial court reasoned that it had an "obligation" to "make sure that under these circumstances, the clear intent of the voter is carried out" when there is "no confusion and no fraud." Thus, the trial court held that the write-in votes should be counted.

With respect to the votes that were not counted, the trial court found V.G.'s testimony to be "credible." However, since V.G. failed to sign the Certificate of Mail-in Voter, the trial court held her ballot could not be counted.

With respect to the votes that were not postmarked until February 18, 2025, the trial court found that the Legislature had set "strict timelines" to "ensure the integrity of the process." Because those ballots were postmarked more than forty-eight hours after the date of the election, those ballots were

"outside the statutory framework."  The trial court drew "a distinction between errors that were caused by the election process versus the voter themselves."

The trial court ruled the final vote totals were as follows:

| | |
|---|---|
| Cirz | 616 |
| Golden | 615 |
| Hopson | 615 |
| Tutela | 690 |

The trial court stayed its order declaring Cirz the winner of the February 15, 2025 election, and we continued the stay based on Hopson's application for leave to file an emergent application, which we granted.  Cirz filed a notice of cross-appeal.  We also accelerated the appeals.

On this appeal, the following five issues are presented for our consideration:

(1)     whether the Fire District Clerk had legal authority to amend the election certificate to count the two write-in votes for Cirz and Golden;

(2)     whether the trial court erred in counting the two write-in votes;

(3)     whether the trial court erred in not counting the mail-in ballot submitted by V.G.;

(4)     whether the trial court correctly refused to count the three mail-in ballots submitted by M.B., P.B., and J.D.; and

13

(5)     whether the trial court erred in denying Cirz's motion to file a third amended answer and cross-petition.

II.

N.J.S.A. 40A:14-70(a) authorizes any municipality to create a Fire District to be governed by a board of five commissioners who are residents of the municipality. The "commissioners of a [F]ire [D]istrict shall have the powers, duties and functions within said district to the same extent as in the case of municipalities, relating to the prevention and extinguishment of fires and the regulation of fire hazards." N.J.S.A. 40A:14-81.

Elections for commissioners shall be held "annually either on the third Saturday in February or at the time of the general election" in November. N.J.S.A. 40A:14-72(a). Pursuant to N.J.S.A. 40A:14-72.1(a), if the Fire District election is held at the time of the November general election, the election procedures "shall be in accordance with the procedures provided for the general election under" under N.J.S.A. Title 19, including N.J.S.A. 19:20-1, which provides that the "board of county canvassers . . . shall proceed to determine what officers have been elected, and the result of the vote cast upon any public question setting forth that it was approved or rejected."

However, for Fire District elections held on the third Saturday in February, as in Toms River, N.J.S.A. 40A:14-77 provides that, "[i]mmediately

14

after the close of the polls the [Fire District] clerk and tellers shall forthwith canvass the vote and certify the results" and the Fire District "Clerk shall publicly announce the results."

III.

A challenger has the burden of proving one or more legal votes were rejected, and that the number of improperly rejected votes were sufficient to change the result of the election.  The challenger is not required to prove that the rejected votes were cast for him or her.  In re Ocean Cnty. Comm'r of Registration for a Recheck of the Voting Machines for the May 11, 2004 Mun. Elections, 379 N.J. Super. 461, 469 (App. Div. 2005) (citing In re Application of Moffat, 142 N.J. Super. 217, 224 (App. Div. 1976); Kirk v. French, 324 N.J. Super. 548, 553 (Law Div. 1998)).

First, we address Hopson's argument that the Fire District Clerk had no legal authority to amend the election certificate to count the two write-in votes for Cirz and Golden.  Hopson contends that N.J.S.A. 40A:14-77 precludes the Fire District Clerk from acting alone.  According to Hopson, the Board should have determined the election results under the framework set forth for municipal and school board elections under Title 19.  Even if the Fire District Clerk had the power to act, Hopson alleges Krohn's second certification of the election results was beyond the time allowed for a change.

We are unpersuaded by Hopson's argument that the Fire District Clerk had no legal authority to amend the election certification as "ultra vires and void." Although N.J.S.A. 40A:14-77 refers to the "clerk and tellers,"[2] the statute clearly gives to the clerk the authority to "publicly announce the results" of the election.

Further, nothing in the applicable statutes sets forth a date by which Fire District election results must be certified. Hopson relies on a timeline document purportedly issued by the Secretary of State that lists February 24, 2025, as the deadline for "Fire District Certification of Election Results," and states that it is "to comply with N.J.S.A. 19:63-22." However, that statute does not provide any specific deadlines for certifying election results. Hopson also asserts that N.J.A.C. 5:31-2.4 requires Fire Districts "to upload the results of the election to the FAST[3] system with the Department of Community Affairs within [ten] days of the election," but that regulation relates only to election results relating to budget referenda, not candidates for Fire District

---

[2] There is no evidence in the record as to who the "tellers" were in this election. We also note the word "teller" is not mentioned in the trial transcripts.

[3] FAST stands for "Financial Automation Submission Tracking." See Financial Automation Submission Tracking ("FAST") System Updates, New Jersey Department of Community Affairs, https://www.nj.gov/dca/dlgs/Fast.shtml (last visited June 25, 2025).

commissioner.

Hopson's argument that the Fire District Clerk was without authority to change the certified election results after first certifying a tie was not addressed by the trial court. In support of his argument, Hopson relies on three cases that pre-date the current election statutes, and the 1947 New Jersey Constitution, citing State v. Governor, 25 N.J.L. 331 (Sup. Ct. 1856), Darling v. Murphy, 70 N.J.L. 435 (Sup. Ct. 1904), and Reed v. Bd. of Cnty. Canvassers, 119 N.J.L. 115 (E. & A. 1937).

As the trial court found, the issuance of two different election certifications by the Fire District Clerk was "questionable" and caused "consternation among the voters of Toms River." This clearly undermined "public confidence in the integrity of the electoral process," which "has independent significance, because it encourages citizen participation in the democratic process." Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 197 (2008); see also In re Malinowski, 481 N.J. Super. 128, 151 (App. Div. 2025). Moreover, the record makes clear the results would have been different if the election had been overseen by the Board because the Board informed Halliwell that its policy was not to count a write-in vote for a named candidate. A difference in outcome based solely on the administrator of the election—in February or November—does not serve the public interest.

We do not hold that the Fire District's issuance of a corrected certification was in and of itself unlawful. Based upon our review of the record, we conclude that Hopson has not demonstrated a "degree of gross negligence or inattention to duty tantamount to purposeful conduct such as fraud or corruption" sufficient to overturn the election on these grounds. In re Mallon, 232 N.J. Super. 249, 272 (App. Div. 1989) (citing N.J.S.A. 19:29-1(a)).

IV.

Next, Hopson contends the trial court erred in allowing the write-in votes for two candidates who were also listed on the regular ballot to be counted. In his cross-appeal, Cirz argues the trial court erred in refusing to count the mail-in ballots of V.G., M.B., P.B., and J.D. The Board counters that New Jersey election law does not permit any of these votes to be counted. The plain language of the governing statute supports the Board's position.

N.J.S.A. 19:29-1 provides, in pertinent part, that the election "of any person to any public office" may be contested on one or more of several grounds, including "[m]alconduct, fraud or corruption on the part of the members of any [D]istrict [B]oard, or of any members of the board of county canvassers, sufficient to challenge the result;" "[w]hen illegal votes have been received, or legal votes rejected at the polls sufficient to change the result;"

18                                                                    A-2536-24

"[f]or any error by any board of canvassers in counting the votes or declaring the result of the election, if such error would change the result;" or "[f]or any other cause which shows that another was the person legally elected . . . ." N.J.S.A. 19:29-1(a), (e), (f), (g).  To be successful in an election contest, a petitioner must prove at least one of these grounds by a preponderance of the evidence.  In re Election for Atl. Cnty. Freeholder Dist. 3 2020 Gen. Election, 468 N.J. Super. 341, 355 (App. Div. 2021).

When we review a trial court's rulings in an election contest, its factual findings are entitled to deference.  Horne v. Edwards, 477 N.J. Super. 302, 312-13 (App. Div. 2023).  Thus, we do not "review the record from the point of view of how [it] would have decided the matter if we were the court of first instance" but we consider the trial court's factual findings "binding on appeal when supported by adequate, substantial and credible evidence."  Id. at 312 (quoting Sebring Assocs. v. Coyle, 347 N.J. Super. 414, 424 (App. Div. 2002); Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). However, the trial court's legal conclusions are reviewed de novo.  D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013); see also Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.").

Both Hopson's and Cirz's challenges to the trial court's decision require us to interpret various provisions of New Jersey's election laws. In interpreting a statute, we must "aim[] to effectuate the Legislature's intent" and the "'best indicator' of legislative intent 'is the statutory language.'" W.S. v. Hildreth, 252 N.J. 506, 518 (2023) (quoting State v. Lane, 251 N.J. 84, 94 (2022)). "As a general proposition, 'election laws are to be liberally construed to the end that voters are permitted to exercise the franchise and that the will of the people as expressed through an election is heard.'" In re Election for Atl. Cnty. Freeholder Dist. 3, 468 N.J. Super. at 353 (quoting In re Contest of Nov. 8, 2005 Gen. Election for Off. of Mayor of Twp. of Parsippany-Troy Hills, 192 N.J. 546, 559 (2007)).

"[O]ur state election laws are designed to deter fraud, safeguard the secrecy of the ballot, and prevent disenfranchisement of qualified voters." In re Gray-Sadler, 164 N.J. 468, 474-75 (2000); see also Langbaum, 201 N.J. Super. 484, 490 (App. Div. 1985) ("deterrence of fraud—maintenance of the integrity of the elective process is one of the primary legislative concerns"). "A citizen's constitutional right to vote for the candidate of his or her choice necessarily includes the corollary right to have that vote counted 'at full value without dilution or discount.'" Gray-Sadler, 164 N.J. at 474 (quoting Reynolds v. Sims, 377 U.S. 533, 555 n.29 (1964)).

Courts should "apply to the statutory terms the generally accepted meaning of the words used by the Legislature," Patel v. N.J. Motor Vehicle Comm'n, 200 N.J. 413, 418 (2009), "read . . . in context with related provisions so as to give sense to the legislation as a whole." DiProspero v. Penn, 183 N.J. 477, 492 (2005). However, even a "straightforward" statute "must be read in light of the broad purpose of the election laws to prevent disenfranchisement of qualified voters." Gray-Sadler, 164 N.J. at 476. "Thus, absent an express legislative directive that a violation of an election law requires invalidation of a ballot, the court must determine whether 'under the circumstances' a ballot should be invalidated to 'effectuate the legislative intent' in establishing a particular voting requirement." In re Petition of Kriso, 276 N.J. Super. 337, 345 (App. Div. 1994).

To that end, courts have cautioned that "[v]oiding the ballot and thus disenfranchising the voter is too harsh a remedy where the deficiency does not affect the integrity of the electoral process." Langbaum, 201 N.J. Super. at 490. A reviewing court "however, may not 'rewrite a plainly-written enactment of the Legislature [or] presume that the Legislature intended something other than that expressed by way of the plain language.'" In re Proposed Constr. of Compressor Station (CS327), 258 N.J. 312, 325 (2024) (quoting O'Connell v. State, 171 N.J. 484, 488 (2002)).

21

A.      Write-In Votes for Cirz and Golden

Hopson argues that N.J.S.A. 19:49-5 does not permit the write-in votes for Cirz and Golden to be counted, because they were candidates listed on the ballot.  The Board supports Hopson's interpretation of N.J.S.A. 19:49-5, which prohibits the counting of a write-in vote for any person who is a candidate listed on the ballot.

N.J.S.A. 19:49-5 states:

> Ballots voted for any person whose name does not appear on the machine as a nominated candidate for office are herein referred to as irregular ballots.  Such irregular ballot shall be written or affixed in or upon the receptacle or device provided on the machine for that purpose.  No irregular ballot shall be voted for any person for any office whose name appears on the machine as a nominated candidate for that office or for a delegate or alternate to a national party convention; any irregular ballot so voted shall not be counted.  An irregular ballot must be cast in its appropriate place on the machine, or it shall be void and not counted.

[Emphasis added.]

Hopson argues that the "statutory framework governing write-in votes is clear and leaves no room for ambiguity or judicial modification."  According to Hopson, under the plain language of that statute, the write-in votes for Cirz and Golden constituted an "irregular ballot," and because both Cirz and Golden's names were also on the ballot as nominated candidates for the office of Fire District commissioner, those irregular ballots "shall not be counted."

22

N.J.S.A. 19:49-5.

Both Hopson and the Board rely on Ocean County, which applied N.J.S.A. 19:49-5 to preclude the counting of a write-in vote. 379 N.J. Super. at 476. In that case, Peter Murphy, an unsuccessful candidate for one of three open seats on the Board of Commissioners of Long Beach Township, contested the election result that he had received one fewer vote than Ralph Bayard, the candidate who had received the third-highest number of votes. Id. at 465-66. Among other issues, Murphy challenged the rejection of a single write-in vote for him "on the basis of N.J.S.A. 19:49-5 because his name appeared as a candidate on the printed machine ballot." Id. at 464, 472-73.

We held the "statutory direction" in N.J.S.A. 19:49-5 to be "unambiguous" and rejected Murphy's claim that the voters were not sufficiently warned about the consequences of writing in a name of a listed candidate. Id. at 473. We noted "the strong public policy in favor of protecting every citizen's right to vote, and to have his or her vote counted" as "[l]ittle is more basic to the concept of a democracy." Id. at 474. We also recognized the "duty to construe elections laws liberally." Ibid. (quoting Gray-Sadler, 164 N.J. at 475). We further held that "the obvious purpose of N.J.S.A. 19:49-5 is to prevent a voter from casting two votes for the same candidate—once by marking the printed name and a second time by writing in

the same name." Id. at 473.

Nevertheless, based on the record in Ocean County, "we [could not] know for certain whether the same voter also cast a proper vote for Murphy and if so, whether it was counted." Id. at 476. Thus, we held, "the unknown write-in voter here was not deprived of the right to cast a vote for Murphy," but was required to do so using the printed ballot. Id. at 476-77. Accordingly, considering those facts, and the fact "[i]t is not too much to expect that a voter would notice . . . his [or her] candidate's name appears as a choice on the ballot and . . . there is a clearly prescribed place on the ballot for expressing that choice," we discerned no basis to undo the certification of election results. Id. at 476.

Cirz argues although the purpose of N.J.S.A. 19:49-5 is to prevent double voting, "that concern is no longer relevant" because of the "widespread and mandatory adoption of optical scan voting machines," which "generate individual printouts of each ballot cast on the machine, including a breakdown of all votes cast" and, thus, "election officials can disqualify true double votes."

Although there is no evidence in the record regarding the voting technology used in the Fire District election, Cirz cites to N.J.S.A. 19:53A-3(i)(1), which mandates that "[b]y January 1, 2009, each voting machine shall

24    A-2536-24

produce an individual permanent paper record for each vote cast, which shall be made available for inspection and verification by the voter at the time the vote is cast, and preserved for later use in any manual audit."  We are not persuaded by Cirz's argument.

Regardless of the voting technology utilized, as stated in Ocean County, the language in N.J.S.A. 19:49-5 is unambiguous: write-in votes for a candidate already on the ballot shall not be counted.  379 N.J. Super. at 472. The Court has recently emphasized the need to follow the plain language of a statute in the absence of any ambiguity.  See In re Proposed Constr. of Compressor Station, 258 N.J. at 325.  Whether the statute as written continues to serve its purpose is a question for the New Jersey Legislature, not the courts.

Relying on Gray-Sadler, 164 N.J. at 468, Cirz further argues the ballot as written did not give voters sufficient warning that their votes would not count if they wrote in the names of candidates already on the ballot, and therefore, the write-in votes should be counted.  As the Court explained, voters were informed to

> "[v]ote for any person whose name is not printed on the ballot, go to the personal choice column, darken the oval and words write-in and the office in which you want to write in, write in the name of the person for which you wish to vote on for in the blank."

25

In Gray-Sadler, the Court reviewed sixty-four write-in votes for municipal offices in Chesilhurst that had not been counted by election officials because they had been placed in the wrong space on the voting machine. Id. at 473-74. None of the write-in candidates were officially on the ballot, but the votes were rejected on the basis of the language in N.J.S.A. 19:49-5 that "[a]n irregular ballot must be cast in its appropriate place on the machine, or it shall be void and not counted." Id. at 472-73, 476.

The Court held although "straightforward," the statutory language "must be read in light of the broad purpose of the election laws to prevent disenfranchisement of qualified voters" and noted that, "[i]n cases involving invalidated write-in votes, our courts have distinguished errors due to extrinsic problems from errors caused by a voter's own neglect." Id. at 476. And, the Court ruled the Legislature did not intend N.J.S.A. 19:49-5 "to be applied in a manner that would frustrate the free expression of the voters' will when the incorrect placement of the write-in vote is the result of mistakes or problems beyond the voters' control." Id. at 477.

Recognizing that the voters clearly intended to vote for the write-in candidates, the Court "ask[ed] why write-in votes were placed on the wrong lines or not cast in the first place," which "should help us to determine whether the 'rejected' voters had their votes invalidated as a result of their own errors or

26

as a result of election officials' noncompliance with statutory requirements." Id. at 478. The Court found that "no information was provided outside the voting booths explaining how properly to cast write-in votes" and information inside the booths contained "conflicting and incomplete instructions," which caused confusion "attributable to defects outside of [voters'] control." Id. at 478-79. Most egregiously, the instructions directed "voters to seek assistance from an official outside the booth" but "[a]nyone who followed that direction would be barred from re-entering the voting machine after having been given instructions," such as one voter who testified as a witness. Id. at 479.

Thus, the Court found these circumstances "readily distinguishable from other cases in which voters' failure to comply with specific procedural instructions invalidated their votes." Id. at 481 (citing In re Mun. Election Held on May 10, 1994, 139 N.J. 553, 558 (1995); In re Keogh-Dwyer, 45 N.J. 117, 120 (1965)). Rather, "Chesilhurst voters . . . were given patently inadequate instructions or none at all." Ibid. Because the write-in voters were effectively disenfranchised, and this affected the election's outcome, the Court ordered that a new election be held. Id. at 484-85. The Court mandated:

> [f]or the new election, and for all future elections throughout the state, explicit instructions on how to cast a write-in vote must be provided with the sample ballots sent to registered voters. The instructions must offer clear, step-by-step directions that describe the mechanics of the voting machine, explain how to

27

operate the windows and levers, and emphasize the need to cast write-in votes on the appropriate lines. Voters must be warned that an improperly cast vote will be deemed void.

[Id. at 484.]

In this matter, Cirz is correct the instructions did not explicitly warn voters that a write-in vote for a candidate already on the ballot would not be counted. However, the instructions for this election did not have the same deficiencies as those in Gray-Sadler. Voters here were instructed that if they wanted to "[v]ote for any person whose name is not printed on the ballot," they should use the write-in procedure. All voters but one complied with that clear instruction.

In similar circumstances presented in Ocean County, we held a write-in vote for a candidate already on the ballot was plainly not a mistake "beyond the voter['s] control." 379 N.J. Super. at 475.

It is not too much to expect that a voter would notice that his candidate's name appears as a choice on the ballot and that there is a clearly prescribed place on the ballot for expressing that choice. This is particularly so in light of the sample ballot that demonstrates, in advance, the names of the candidates as they will appear on the voting machine.

[Id. at 476.]

In Ocean County, we also found significant that only one voter, as here, made the mistake of writing in a candidate who was already on the ballot,

28

noting that "a reasonable voter would understand, without explicit instruction, that it is unnecessary to write in the name of a candidate whose name already appears on the ballot, and that a vote for that candidate must be cast by marking the place on the ballot where that candidate's name appears." Id. at 477. Applying these principles to the matter before us, we reject Cirz's objections to the write-in voting instructions.

B.  V.G.'s Mail-In Vote

Cirz argues in his cross-appeal that the trial court erred in failing to count V.G.'s mail-in ballot after the Board denied her the opportunity to cure the deficiency. Both the Board and Hopson argue that V.G.'s ballot was properly rejected. We hold that V.G.'s ballot was correctly rejected.

Pursuant to N.J.S.A. 19:63-13, the inner envelope of all mail-in ballots contains a Certificate of Mail-In Voter in the following form:

> I, _____, whose
> (print your name clearly)
>
> home address is _____
> (street address or R.D. number) (municipality)
>
> DO HEREBY CERTIFY, subject to the penalties for fraudulent voting, that I am the person who applied for the enclosed ballot. I MARKED AND SEALED THIS BALLOT AND CERTIFICATE IN SECRET. However, a family member may assist me in doing so.
>
> _____
> (signature of voter)

29

There is no dispute V.G. failed to complete this Certificate of Mail-In Voter, and thus, failed to comply with the requirements of N.J.S.A. 19:63-16(a) that all mail-in voters must "fill in the form of certificate attached to the inner envelope, at the end of which the voter shall sign and print the voter's name." The record shows V.G. left the entire Certificate blank.

As amended by L. 2020, c. 70, N.J.S.A. 19:63-17 permits mail-in voters to cure their incorrect ballots in limited circumstances involving "a missing signature or discrepant signature." In that regard, N.J.S.A. 19:63-17(b) provides that:

> [t]he county board of elections shall, promptly after receiving each mail-in ballot, undertake the following procedures and requirements concerning the acceptance or rejection of each mail-in ballot:
>
> (1) within [twenty-four] hours after the decision has been made to reject a voter's mail-in or provisional ballot on the basis of a missing signature or discrepant signature, issue a "Cure Letter" by mail or email to the voter whose ballot was rejected, which shall inform the voter of that fact and provide the reasoning for rejection, and attempt to contact the voter by telephone, if a telephone number is available. The cure letter shall include a "Cure Form" and the form shall include the voter's name and instruct the voter on how to cure the alleged or actual deficiency. Cure forms shall not be referred to as affidavits or certifications and shall not be required to be sworn;
>
> (2) when the alleged or actual deficiency involves the signature of the voter, instruct the voter that they may cure the deficiency by completing the cure form and

returning it to the county board of elections in person, by fax, or by email, not later than [forty-eight] hours prior to the final certification of the results of the election other than the general election, or in the case of a general election within [eleven] days after the general election, or by returning it to the county board of elections by mail, and that the completed cure form must be received by the county board of elections not later than [forty-eight] hours prior to the final certification of the results of the election other than the general election, or in the case of a general election within [eleven] days after the general election;

(3) include, with the cure letter, when sent by mail, a pre-printed cure form and a postage-paid return envelope addressed to the county board of elections which the voter may use to return the cure form; and

(4) inform voters that they shall not be required to submit any form of hard-copy identification document or copy thereof in order to cure a signature deficiency, but may do so by declaring that they submitted their provisional ballot or mail-in ballot, and verifying their identity by either:  (a) providing a valid New Jersey driver's license number or Motor Vehicle Commission non-driver identification number; or (b) if the voter does not have a valid New Jersey driver's license number or Motor Vehicle Commission non-driver identification number, then by providing the last four digits of their Social Security Number; or (c) if the voter does not have the identification in (a) or (b), then attaching a legible copy of a New Jersey State-accepted form of identification, including either a sample ballot which lists the voter's name and address, an official federal, State, county, or municipal document which lists the voter's name and address, or a utility bill, telephone bill, or tax or rent receipt which lists the voter's name and address; and (d) signing and dating the cure form prior to returning it.

31

If the voter "returns a completed cure form in a timely manner and the information provided verifies the voter's identity, pursuant to this section, their otherwise valid mail-in or provisional ballot shall be counted in the final election results irrespective of any signature deficiency previously identified . . . ."  N.J.S.A. 19:63-17(c).

Cirz maintains that because V.G.'s ballot rejection involved a missing signature, N.J.S.A. 19:63-17(b) required the Board to offer her the opportunity to cure the ballot errors.  As V.G. testified, she went to the Board within the time set forth in N.J.S.A. 19:63-17(b)(2) to cure her ballot errors, but the Board refused to allow her to do so.

The Board counters that because the deficiency in V.G.'s ballot involved more than just her signature and was an entirely blank Certificate of Mail-In Voter, the Board had no statutory right to offer her the opportunity to cure.  In support of its argument, the Board claims that "[n]either N.J.S.A. 19:63-17 nor any other part of Title 19 allows" the Board to allow any voter "to cure [a] mail-in ballot when the [C]ertificate is left completely blank."

We affirm the trial court's decision not to count the mail-in ballot submitted by V.G.  The evidence shows that V.G.'s inner envelope was not filled out.  Thus, V.G. did not print her name, her street address, or sign the inner envelope as required by N.J.S.A. 19:63-16(a).  As just discussed,

32

N.J.S.A. 19:63-17 permits mail-in voters to cure ballots only if the signature is missing. We do not construe the statute as allowing the cure of a ballot submitted with an inner envelope that was left completely blank.

C.     Mail-In Ballots Postmarked February 18, 2025

Cirz also argues that the trial court erred in disqualifying the three mail-in ballots because those ballots were postmarked February 18, 2025. The Board and Hopson assert that the ballots were properly disqualified. We agree that the ballots were correctly rejected.

N.J.S.A. 19:63-22(a) sets clear, explicit deadlines for the receipt of mail-in ballots, stating:

> Every mail-in ballot that bears a postmark date before or of the day of the election and that is received by the county board within 144 hours after the time of the closing of the polls for the election that the ballot was prepared shall be considered valid and shall be canvassed. Every mail-in ballot that does not bear a postmark date but that is received by the county board by delivery of the United States Postal Service before, or within [forty-eight] hours after, the time of the closing of the polls for the election for which the ballot was prepared shall be considered valid and shall be canvassed.

There is no dispute that the three ballots mailed by M.B., P.B., and J.D. did not comply with either of these requirements. Each of the three ballots was postmarked on February 18, 2025, three days after the date of the Fire District election.

33

Cirz urges us to allow these ballots to be counted because, as the trial court found, the voters credibly testified that they placed their ballots in their mail boxes on the day of the election, but the envelopes containing the ballots were postmarked three days later, after the weekend, three days after the Saturday election, and after the President's Day holiday. Cirz also argues we should apply the time standards set forth in Rule 1:3-1,[4] so that the time period does not start running until the next business day.

The statutory construction urged by Cirz would alter the meaning of the statute's plain language. The ballots at issue neither lacked a postmark, nor were they postmarked on or before the date of the election. Moreover, as the Board points out, the Toms River Post Office is open on Saturdays. Cirz offers no legal support for his argument that the clear terms of N.J.S.A. 19:63-22 should be ignored in the circumstances here. And, Cirz does not offer any

---

[4] Rule 1:3-1 provides:

> In computing any period of time fixed by rule or court order, the day of the act or event from which the designated period begins to run is not to be included. The last day of the period so computed is to be included, unless it is a Saturday, Sunday[,] or legal holiday, in which event the period runs until the end of the next day with is neither a Saturday, Sunday[,] nor legal holiday. In computing a period of time of less than [seven] days, Saturday, Sunday[,] and legal holidays shall be excluded.

support for the application of the time standards under <u>Rule</u> 1:3-1. Therefore, we reject Cirz's argument and conclude the clear terms of N.J.S.A. 19:63-22 preclude the mail-in ballots postmarked on February 18, 2025, from being counted.

V.

Next, Cirz argues the trial court erred in denying his motion for leave to file a third amended answer and cross-petition to include an additional challenge to a single mail-in ballot that was rejected by the Board as an overvote. Hopson argues that the trial court properly denied Cirz's motion, which was filed one business day before trial, on April 11, 2025, as it was prejudicial to Hopson. The ballot Cirz challenged was a mail-in vote by an unidentified voter that had been rejected by the Board because the voter blacked in the circles next to both Cirz's and Golden's names and also blacked in one circle in the "Personal Choice—Write-In" column, but did not write in any name.

At the close of the first day of trial, the trial court addressed Cirz's motion for leave to amend. Counsel for Cirz argued that it had taken a significant amount of time to review the "more than 1,300 ballots that we had to go through," which was the reason the motion was filed just before the trial date. Counsel for Hopson countered that all of the parties possessed all of the

ballots at issue since March 25, 2025, and there was no new information justifying Cirz's delay. Hopson further argued that granting Cirz's motion would be prejudicial to Hopson since he had based his "case strategy" on the ballot challenges Cirz had previously made.

In denying Cirz's motion to amend, the trial court found no "extraordinary circumstance," and that to allow the amendment would be an "unfair surprise" to Hopson. The trial court also found that "the prejudice outweighs any probative value that would be offered to this dispute."

Under Rule 4:9-1, once a responsive pleading has been served, a complaint may be amended "only by written consent of the adverse party or by leave of court which shall be freely given in the interest of justice." This Rule "'requires that motions for leave to amend be granted liberally' and that 'the granting of a motion to file an amended complaint always rests in the court's sound discretion.'" Notte v. Merchs. Mut. Ins. Co., 185 N.J. 490, 501 (2006) (quoting Kernan v. One Wash. Park Urb. Renewal Assocs., 154 N.J. 437, 456-57 (1998)).

This "exercise of discretion requires a two-step process: whether the non-moving party will be prejudiced, and whether granting the amendment would nonetheless be futile"; "that is, whether the amended claim will nonetheless fail and, hence, allowing the amendment would be a useless

endeavor." Ibid. "[T]he factual situation in each case must guide the court's discretion, particularly where the motion is to add new claims or new parties late in the litigation." Bonczek v. Carter Wallace, Inc., 304 N.J. Super. 593, 602 (App. Div. 1997).

"One of the factual situations to be considered by the trial court is the reason for the late filing." Verni ex rel. Burstein v. Harry M. Stevens, Inc., 387 N.J. Super. 160, 196 (App. Div. 2006) (citing Bonczek, 304 N.J. Super. at 602). We "review a trial court's decision to grant or deny a motion to amend the complaint for abuse of discretion." Grillo v. State, 469 N.J. Super. 267, 275 (App. Div. 2021) (quoting Port Liberte II Condo. Ass'n v. New Liberty Residential Urb. Renewal Co., 435 N.J. Super. 51, 62 (App. Div. 2014)).

Before us, Cirz challenges Hopson's assertions of prejudice. A factual finding by the trial court is entitled to deference, and it is based on competent, credible evidence in the record. See Horne, 477 N.J. Super. at 312-13. As Hopson points out, prior to Cirz's proposed amendment, he had challenged two ballots, and Cirz challenged six ballots. Based on those numbers, the record supports Hopson's position that he "made calculated decisions, including forgoing challenges to other questionable ballots uncovered during discovery." Therefore, we discern no abuse of discretion in the trial court's finding of prejudice to Hopson.

Moreover, Cirz makes no showing that his challenge to this purported "overvote" ballot had any likelihood of success on the merits. N.J.S.A. 19:16-3(a) provides that

> If proper marks are made in the squares to the left of the names of any candidates in any column and the total number voted for, for each office, does not exceed the number of candidates to be elected to each office, a vote shall be counted for each candidate so marked.

Further, N.J.S.A. 19:16-3(f) provides:

> If a voter marks more names than there are persons to be elected to an office, or writes or pastes the name of any person in the column designated personal choice, whose name is printed upon the ballot as a candidate under the same title of office, or his choice cannot be determined, his ballot shall not be counted for that office, but shall be counted for such other offices as are plainly marked.

Here, the voter in question made three separate, clear marks on a ballot where he or she was permitted to only vote for two individuals. Thus, the marks "exceed[ed] the number of candidates to be elected to each office" under N.J.S.A. 19:16-3(a) and further made it impossible for a reviewer to determine the voter's choice under N.J.S.A. 19:16-3(f). Therefore, "allowing the amendment would" have been "a useless endeavor." Notte, 185 N.J. at 501.

# VI.

In summary, we affirm the trial court's decision not to count the mail-in ballot submitted by V.G., we reverse the trial court's decision permitting the three write-in votes to be counted, and we affirm the trial court's decision barring Cirz from filing a belated third amended answer and cross-petition. We, therefore, remand the matter for entry of an order directing a run-off election between Hopson and Cirz for the remaining open Commissioner seat. The stay of Cirz assuming the position as one of the Fire District Commissioners is continued until the completion and certification of the run-off election.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with our opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

39                                                     A-2536-24